MARVIN R. RAGAN *et al.*, Plaintiffs-Appellants, *v.* GERALD PROTKO, d/b/a
Bea's Junction, Defendant-Appellee.

Fifth District   No. 77-457

Opinion filed November 28, 1978.

G. MORAN, J., dissenting.

Amling & Beyers, of Pana, for appellants.

John P. Lynaugh, of Springfield, and Jack L. Brooks, of Klockau, McCarthy, Lousberg, Ellison & Rinden, of Rock Island, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

This is an appeal from a judgment entered in favor of defendant Gerald Protko, a tavern operator, in an action brought under section 14 of article VI of the Liquor Control Act, commonly referred to as the Dramshop Act (Ill. Rev. Stat. 1973, ch. 43, par. 135).

Plaintiffs, Marvin R. and Imogene Ragan, are the parents of Cyrus Ragan, deceased, who was 21 years old at the time of the accident that is relevant to this cause. The instant action was commenced to recover for injury to their "property" resulting from the intoxication of their son. See Ill. Rev. Stat. 1973, ch. 43, par. 135.

The primary issue on appeal is whether parents of a son of legal age can recover for his medical, hospital and funeral expenses as injury to their "property" under the Dramshop Act where their payment of the expenses is not made pursuant to a preexisting legal liability for such charges.

The record reveals that Cyrus Ragan patronized defendant's tavern near Taylorville, known either as "Bea's Junction" or "Freddies" between 7 p.m. and 12 p.m. on July 24, 1973. While there, he consumed four or five mixed drinks (Harvey Wallbangers) and six to eight beers. Before leaving the tavern, Cyrus asked a fellow employee, Malcolm McClung, to follow him as he drove his car home to Pana, Illinois. Malcolm McClung observed that once Cyrus' car was beyond the city limits of Taylorville, it drew rapidly away from McClung's vehicle which was traveling at 55 m.p.h. Cyrus Ragan's car then began weaving to both sides of the road while its lights went off and on. Cyrus was thereafter involved in a one-car collision, receiving serious head and chest injuries.

Cyrus Ragan was under constant medical care for his injuries in the next eight months until his death on March 24, 1974. He never regained consciousness. Cyrus was initially placed in the intensive care unit in St. John's Hospital in Springfield, Illinois for 18 days. During that time his parents stayed in the care unit's lounge and took their meals in the hospital cafeteria. In late October of 1973, Cyrus and his parents were flown by air ambulance to the Mayo Clinic in Minnesota. The plaintiffs spent the first night in a hotel and the rest of the time in a motel nearer the clinic. After eight days treatment, Cyrus was returned to Taylorville where he remained until his death. During the periods of Cyrus' hospitalization in Springfield and Taylorville, his parents visited four or five times weekly, round-trip distances being 100 miles to Springfield and 40 miles to Taylorville.

Plaintiff's Exhibit No. 3, a hospital form, contains the following declaration signed by plaintiff Marvin Ragan:

> "I hereby authorize payment directly to St. John's hospital of the Hospital benefits otherwise payable to me but not to exceed the hospital's regular charges for this period of hospitalization. *I*

*understand that I am financially responsible to the hospital for charges not covered by this authorization."* (Emphasis added.)

Marvin Ragan testified that it was his understanding when he signed the form that he would be responsible for any bills that Cyrus incurred. His sentiments were, "What father isn't going to take care of his son." Mr. Ragan assumed that he signed similar financial responsibility forms with respect to other charges. On cross-examination, Mr. Ragan stated that no one specifically told him that he had a legal responsibility for these bills but he assumed that he did.

Offered into evidence were numerous cancelled checks of the plaintiffs' for medical charges and funeral expenses and insurance vouchers showing the amounts of individual claims and the benefits actually paid thereon.

In this action the plaintiffs sought to recover Cyrus' medical, hospital and funeral expenses and the expenses for meals, lodging and transportation which they incurred while attending to Cyrus during his medical treatment. They also sought to recover for the destruction of Marvin Ragan's 1972 Chevrolet Vega automobile.

It was also adduced at trial that Cyrus Ragan was a full-time college student at Monmouth College. He had a State scholarship for approximately $1,000 but the remainder of his yearly college expenses, some $4,000 to $5,000 was paid by his parents. During the summer breaks, Cyrus lived with his parents in Pana and worked for the Christian County Highway Department. He paid no living expenses and used the $700 or $800 that he earned at his summer job as spending money. Cyrus was claimed as a dependent on his parents' income tax returns for 1972 and 1973.

There are very few dramshop decisions that have any relevance to the issue presented for our resolution.

In *Fortner v. Norris* (1958), 19 Ill. App. 2d 212, 153 N.E.2d 433, the appellate court held that the trial court had erred in dismissing an "injury in property" dramshop action brought by a wife on the basis of her legal liability for the medical, hospital and funeral expenses of her husband. Plaintiff's husband's injuries and death had resulted from gunshot wounds inflicted upon him by an allegedly intoxicated patron of defendant's tavern.

The court, noting that the family expenses act (Ill. Rev. Stat. 1957, ch. 68, par. 15) imposed an absolute legal liability on the plaintiff for her husband's hospital, medical and funeral expenses, held that she had sufficiently alleged an "injury in property" within the meaning of the Dramshop Act. It specifically rejected the proposition that a direct physical injury to one's tangible real or personal property is required in order for a person to be "injured in property."

In reaching its decision the court discussed two previous dramshop cases where recovery had been sought and allowed on the basis that the plaintiffs had become legally obligated for certain expenses because of their relative's or another's intoxication, *Danley v. Hibbard* (1906), 222 Ill. 88, 78 N.E. 39, and *Haw v. 1933 Grill, Inc.* (1938), 297 Ill. App. 37, 17 N.E.2d 70.

Three years later, in *Shepherd v. Marsaglia* (1961), 31 Ill. App. 2d 379, 176 N.E.2d 473, the Appellate Court, Second District, was confronted with a similar issue but with the significant difference that the claim was made by parents for sums spent in curing their minor son of injuries which he received in a car accident that occurred upon his leaving defendants' taverns.

The court there also held that the plaintiffs' "property" cause of action was improperly dismissed even though they had not specifically pleaded the family expense statute (Ill. Rev. Stat. 1959, ch. 68, par. 15).

The court stated in pertinent part:

> "This act [family expense act] imposed a *legal liability* on the plaintiffs, Edwin L. Shepherd, Sr., and Priscilla M. Shepherd, to pay medical and hospital expenses incurred in the treatment of their minor son,[1] Edwin L. Shepherd, Jr., and we conclude that assets or money used for the payment of such expenses and the incurring of liability for the payment of same is property within the meaning of Section 14 of Article VI of the Dram Shop Act." (Emphasis added.) 31 Ill. App. 2d 379, 385, 176 N.E.2d 473, 476.

Most relevant to the factual situation presented here is the decision of *Sapp v. Johnston* (1973), 15 Ill. App. 3d 119, 303 N.E.2d 429.

In *Sapp*, 21-year-old Charles C. Sapp, Jr. filed a complaint under the Dramshop Act based on injuries he received while a passenger in a car driven by Michael Minch, who was allegedly intoxicated after visiting defendants' taverns. While a motion for summary judgment was under consideration, Sapp filed a motion for leave to amend his complaint. The amendment would have added plaintiff's father, Charles C. Sapp, Sr., as a party plaintiff and an allegation of injury in the property of the father in that he would be required to pay for medical services provided for his son. The court thereafter granted the motion for summary judgment and denied plaintiff's motion to amend, finding that the proposed amendment was banned by the limitations period of the statute.

The appellate court declined to consider whether the limitations ruling was correct since it believed that the claim for medical expenses by the father was baseless.

The court specifically found that the father did not incur liability for

---

[1] *Graul v. Adrian* (1965), 32 Ill. 2d 345, 205 N.E.2d 444, established that funeral expenses of a minor child are encompassed by the family-expense section as much as medical expenses. The family-expense provision is now Ill. Rev. Stat. 1977, ch. 40, par. 1015.

the payment of his adult son's medical expenses. In doing so, the court examined the statutes expressly relied on in the proposed amendment and the common law. It found that the father was not liable for the cost of medical services under section 7—6 of the Illinois Public Aid Code (Ill. Rev. Stat. 1971, ch. 23, par. 7—6), and that he was not liable under the family expense section of the husband and wife act (Ill. Rev. Stat. 1971, ch. 68, par. 15) because the son was not a minor child. The court concluded that "the liability of a parent for medical services furnished to a child does not extend to an adult child capable of earning his own living at the time of reaching majority." 15 Ill. App. 3d 119, 124, 303 N.E.2d 429, 432.

■■ From the foregoing cases, we conclude that in order for a parent to recover for his child's medical and funeral expenses, he must be legally liable for the charges, and the basis for such liability must exist prior to the creation of the charges and not arise due to a voluntary assumption of financial responsibility after the fact.[2] Practically speaking once a child has reached majority, his parents are no longer legally liable for his medical bills (see Ill. Rev. Stat. 1977, ch. 40, par. 1015; *Graul v. Adrian*; *Sapp v. Johnston*), and they cannot be injured in their property within the meaning of the Dramshop Act when they either pay or assume liability for medical or funeral expenses caused by their offspring's intoxication.

The plaintiffs do not argue in this court that any obligation on their part for the instant bills arose by operation of law. They recognize that the interpretation of the case law which we have made would preclude them from recovery of the medical, hospital and funeral expenses of their son. They assert, however, that the essential element of this type of action according to the court in *Fortner* is the lessening of one's estate, and that such lessening is sufficiently shown under *Fortner* and *Shepherd* whenever one has either paid or incurred liability for medical bills and related expenses regardless of the basis for such payment or obligation. We cannot agree. A close reading of both of these cases discloses that these principles are inextricably linked to the plaintiff's legal liability for the expenses arising by operation of law.

The statute requires that the plaintiff be injured in property "by an intoxicated person." As stated by the court in *Hernandez v. Diaz* (1964), 31 Ill. 2d 393, 399, 202 N.E.2d 9, 13:

" '[B]y' as used in the Liquor Control Act is the equivalent of a causal relation between an act of the intoxicated person and the injury."

---

[2] The court is aware of the case of *Kelly v. Hughes* (1962), 33 Ill. App. 2d 314, 179 N.E.2d 273, wherein an issue similar to that in *Shephard* and *Sapp* was presented. Since, however, we have not found it enlightening in any manner, we chose not to discuss it in any detail. The court in *Kelly* neglected to mention such pertinent information such as the age of the daughter.

The causal relation, should plaintiffs' theory be accepted, would be attenuated to an impermissible degree. For instance, in the present situation one can easily see the connection between the act of Cyrus Ragan and the creation of the charges; however, there is no direct connection between the act and the alleged injury to plaintiffs. They became liable for the charges solely as a result of their voluntary assumption of liability for them. Their "injury" simply was not caused "by an intoxicated person." There is no such break in the causal connection when the plaintiffs become legally liable for the intoxicated persons medical expenses by operation of law.

Logic guides us to the conclusion that since the instant medical and hospital expenses are not compensable under the Dramshop Act, the personal expenditures of the plaintiffs made during Cyrus' treatment are similarly noncompensable. We make no finding as to whether such expenses would ever be recoverable. The case law does not provide any answer to this question. We do note, however, one factor which weighs against their allowance, namely, the extent to which such expenditures are within the exclusive control of potential plaintiffs.

The final item for discussion is whether the trial court erred in entering a judgment which denied plaintiffs' recovery for the loss of the automobile as well as for the other items already discussed.

The defendant concedes in its brief that the loss of the instant 1972 Vega automobile would be recoverable under the act if sufficient evidence of its value were admitted at trial, but asserts that the trial court's judgment must be affirmed because plaintiffs did not adequately prove the amount of damages. We agree.

It has been stated that when personal property cannot be economically repaired, the measure of damages is the difference between its market value before the injury and the market value of the wreckage. (*Trailmobile Division of Pullman, Inc. v. Higgs* (1973), 12 Ill. App. 3d 323, 297 N.E.2d 598; *Janicek v. Szmitke* (1964), 48 Ill. App. 2d 214, 198 N.E.2d 694.) More specifically, it has been held that the measure of damages for an automobile damaged beyond repair is the fair cash value of the automobile at the time of the collision less the fair cash market value of the salvage thereof. *Noel v. Hale* (1961), 33 Ill. App. 2d 286, 177 N.E.2d 886 (abstract).

In this case the only evidence with respect to the damages to the automobile was supplied by plaintiff Marvin Ragan. He testified that he thought the value of the car was $2,500 at the time it was wrecked and that it was a total wreck.

It is fundamental that the plaintiff has the burden of proving his damages by a preponderance of the evidence. Plaintiffs have failed to meet this burden here.

■■ Plaintiffs presented no evidence whatsoever of the salvage value of their vehicle. Moreover, with respect to the preinjury value, only the unsubstantiated and uncertain opinion of the plaintiff was offered. No basis was laid for this opinion. Under these circumstances no knowledge of values is revealed sufficient to qualify Mr. Ragan as a witness as to the value of the car. (*Adams v. Ford Motor Co.* (1968), 103 Ill. App. 2d 356, 361, 243 N.E.2d 843, 846.) Consequently, no damages may be awarded based upon his opinion.

For the foregoing reasons, we affirm the judgment of the circuit court of Christian County.

Affirmed.

KARNS, J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

The majority relies upon *Sapp v. Johnston*, 15 Ill. App. 3d 119, for its result in this case. In *Sapp* the father and mother were divorced and the adult son resided with the mother. (Thus the son was emancipated.) Under these facts the court in *Sapp* held that there was no common law duty of the father to support the son and that the father was not liable under the family expense section of the husband and wife act (Ill. Rev. Stat. 1957, ch. 68, par. 15).

The facts in this case are much different. Plaintiffs' son, Cyrus, was barely past the age of 21, he was living with and being supported by his parents, both during the summer and when he was attending school. He was claimed as a dependent in plaintiffs' income tax for the year before the accident and also for the year the accident occurred.

At the time of the accident, section 15 of the husband and wife act provided:

> "The expenses of the family and of the education of the children shall be chargeable upon the property of both husband and wife, or of either of them, in favor of the creditors therefor, and in relation thereto they may be sued jointly or separately."

In my opinion this act imposed on both parents the obligation to pay the medical, hospital and funeral expenses of their son and the assets used by the father in payment of these expenses were properly within the meaning of the Dramshop Act. This is so because Cyrus, although 21 years of age, was not yet emancipated.

Emancipation as employed in the law of parent and child means the relinquishment of parental control, conferring on the child the right to its own earnings and terminating the parents' legal liability of support.

> "Ordinarily attainment of its majority emancipates a child, and

gives the right to renounce the legal rights and duties of the relation to the child or the parent. On the other hand, there is no fixed age at which a child necessarily becomes emancipated, and the fact that a child has attained its majority does not, ipso facto, work emancipation; a child is not emancipated where it continues to live with the parent, and the latter continues to provide it support and care." 67 C.J.S. *Parent & Child* §89.

*State Farm Mutual Automobile Insurance Co. v. Differding,* 46 Ill. App. 3d 15, involved the question of whether a Miss Differding qualified for insurance coverage as a member of her parents' household under a policy issued by plaintiff to her parents. At the time of the accident which precipitated the dispute over the policy coverage, Miss Differding was attending Northern Illinois University on a post-graduate basis. While at the university she would rent various apartments to live in as her needs arose and her choice of locations varied. During her enrollment at Northern she maintained a permanent residence with her mother and father at 8 Oak Lane, Park Forest, Illinois. She used this address on various personal documents to denote her permanent home. These items include her Illinois driver's license, voter's registration card, library card, checking account, income tax statements and student activities fees receipt from Northern. Throughout her attendance at Northern she would regularly return to Park Forest on weekends, semester breaks and school vacations. In deciding that Miss Differding was unemancipated and therefore qualified for coverage under the policy in question, the court said:

"In determining whether Miss Differding is covered under this section of the policies, the question becomes whether she was emancipated.

What constitutes an emancipation is a question of law, but whether there has been an emancipation is a question of fact. [Citations.] State Farm argues both issues, urging Miss Differding had reached the age of majority and was therefore emancipated as a matter of law, along with claiming she was in fact emancipated and not a resident of the Differding household.

As to the question of emancipation as a matter of law, the Supreme Court of New Jersey, citing common law cases including *Rex v. Roach* (1795), 101 Eng. Rep. 536, 6 T. R. 248, concluded it is a general rule, and always has been so, that attaining the age of 21 years is not ipso facto emancipation of the child from his or her father, although at that age a child may emancipate himself by separating from his father. [Citation.]

The Illinois Supreme Court has never rendered an opinion on

whether all children reaching majority are emancipated. In *Waldron v. Waldron* (1973), 13 Ill. App. 3d 964, 968, 301 N.E.2d 167, 171, while recognizing the age of majority in Illinois as being 18 years of age, the appellate court (5th District) held an 18-year-old child was not emancipated and the father's obligation to pay support under a divorce decree therefore did not end.

The absence of a definitive ruling by the Illinois Supreme Court along with the appellate court opinion in *Waldron* and sister state opinions indicate the meaning of the term 'unemancipated,' as used in the policies of insurance, may include those who have attained the age of majority.

Insurers write the policies and if the language of the contract has a dual interpretation they must be charged with the ambiguity. [Citation.] State Farm could have cleared any ambiguity by using the description 'unemancipated minor children' rather than 'unemancipated children,' in defining those who are deemed to be residents of the insured's household, but did not do so and now must be charged with the ambiguity.

Even without the rule of construction in favor of insured persons and against insurance companies the same result would be reached. Along with the Illinois appellate court in *Waldron* the Illinois legislature recognizes parental rights and duties as to children who have reached the age of majority. By State statute the county circuit court may order payments for support of a child whether of minor or majority age. (Ill. Rev. Stat. 1973, ch. 40, pars. 14, 19.) The law in Illinois is in accord with the common law and the common understanding of the term. The test is not the age of the child but whether there is an entire surrender of the right to care, custody and earnings of such child as well as a renunciation of parental duties.

Regarding the question of fact as to whether Miss Differding was unemancipated, numerous circumstances must be examined. By definition, within the insurance contracts, 'unmarried and unemancipated children, while away * * * attending school, are deemed to be residents * * * .' It is uncontroverted that Miss Differding was unmarried and was away attending school. Most importantly, there is ample proof Miss Differding maintained a permanent residence with her family in Park Forest during her entire enrollment at Northern. She used her Park Forest address on her driver's license, voter's registration card, library card, checking account and income tax statements, and she regularly returned to her family residence on weekends, vacations and semester breaks.

After considering the entire record, we hold Miss Differding was in fact unemancipated and qualifies for insurance coverage as a resident of the Differding household." 46 Ill. App. 3d 15, 19-20.

Under the rationale of the *Differding* case, Cyrus was not yet emancipated. By agreement with his parents Cyrus stayed in their home and accepted their love, affection, support and education. Thus he was not yet emancipated and they were still liable for his support under the family expense statute and under common law.

In *Hight v. Hight*, 5 Ill. App. 3d 991, the court discussed the 1967 amendment to the Divorce Act which provided that the trial court in a divorce case could provide for the payment of support for education of children past their majority. In speaking of the amendment, the *Hight* court said:

"The amendment now makes it clear that whether a parent should or should not provide for the education of children does not and ought not depend upon whether the children have reached their majority. There can be little doubt but that the statutory amendment recognizes a broader necessity for additional education of children and a broader responsibility for parents to provide the education in accordance with the needs, ability and financial resources of parents and children." 5 Ill. App. 3d 991, 993.

In 67 C.J.S. *Parent & Child* §17, the author says:

"The legal liability for the support of the child ceases when it reaches the age of majority unless the child elects to remain the servant of its father, under his roof, and receive support from him, or unless it is in such a feeble and dependent condition physically or mentally as to be unable to support itself;* * * ."

In this case Cyrus was still under his parents' roof when he became "feeble and dependent" upon his father and mother until his death as the result of an accident. Surely they cannot be classified as mere volunteers when they carried out their parental duties by paying his medical and funeral expenses.