AMY CLARK *et al.*, Indiv. and as Parents and Next Friends of Timothy Clark, a Minor, Plaintiffs-Appellants, v. THE CHILDREN'S MEMORIAL HOSPITAL *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—08—0610

Opinion filed April 9, 2009.

322

GALLAGHER, J., specially concurring.

Hurley McKenna & Mertz, of Chicago (Christopher T. Hurley and Mark R. McKenna, of counsel), for appellants.

Lowis & Gellen, LLP, of Chicago (Pamela L. Gellen and Deborah M. O'Brien, of counsel), for appellees.

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiffs, Amy and Jeff Clark, appeal the dismissal of their 16-count, third-amended complaint alleging negligence against defendants, Children's Memorial Hospital and Doctor Barbara K. Burton,

in connection with their son's birth with Angelman Syndrome. The primary issue on appeal is whether plaintiffs may recover in a so-called "wrongful birth" action for their damages for the extraordinary costs of caring for their unemancipated, disabled son beyond the age of majority. We hold that such damages are recoverable and affirm in part, reverse in part, and remand for further proceedings.

Plaintiffs allege the following facts in their third-amended complaint.

Plaintiffs' first son, Brandon, was born July 13, 1997. At about 15 months of age, Brandon began to demonstrate certain developmental problems, including poor head growth and the inability to walk or talk.

On or about February 6, 2001, Amy Clark sought genetic testing and counseling from Doctor Burton to determine whether Brandon suffered from a condition known as Angelman Syndrome. Angelman Syndrome is a genetic disorder that can be caused by abnormal function of the gene UBE3A, located within a small region on chromosome No. 15. In about 80% of individuals with Angelman Syndrome, this region is deleted from the maternally derived chromosome due to a UBE3A truncating mutation. Individuals with Angelman Syndrome suffer from seizures, gait and movement disorders, hyperactivity, sleep disturbances, behavioral disorders, inappropriate happy demeanor, and mental retardation.

On February 6, 2001, Doctor Burton informed Amy that all known genetic mechanisms for Angelman Syndrome in Brandon had been ruled out. This information was incorrect, as Baylor College of Medicine previously had performed a UBE3A sequence analysis of Brandon's DNA and had issued a report on November 8, 2000, indicating that Brandon suffered from Angelman Syndrome due to a UBE3A truncating mutation. The siblings of a child with a mutation of the UBE3A gene have a 50% risk of being born with Angelman Syndrome.

Doctor Burton never obtained the results of the Baylor College of Medicine UBE3A sequence analysis and never informed Amy that the sequence analysis confirmed that Brandon suffered from Angelman Syndrome due to a UBE3A truncating mutation. Because Doctor Burton informed Amy that all known genetic mechanisms for Angelman Syndrome in Brandon had been ruled out, Amy planned to conceive another child.

On or about March 27, 2002, Amy gave birth to a son, Timothy. In June 2002, Amy noticed that Timothy experienced jerky and unpredictable motor movements, was inappropriately happy, and suffered from a flat occiput. In September 2002, Amy contacted Doctor Soma Das at the University of Chicago Hospitals to discuss Timothy's symptoms.

Doctor Das informed Amy that Timothy and Brandon should be entered into a study of Angelman Syndrome, but that the boys could not enter the study without a complete set of Brandon's medical records.

On or about September 30, 2002, Amy contacted Baylor College of Medicine by phone to obtain a copy of Brandon's UBE3A sequence analysis. On or about September 30, 2002, Amy learned for the first time, from an employee of the Baylor College of Medicine, that the result of Brandon's UBE3A sequence analysis was "not normal." Subsequently, Timothy was diagnosed with Angelman Syndrome.

Plaintiffs ultimately filed a 16-count, third-amended complaint sounding in wrongful birth and negligent infliction of emotional distress against defendants. Plaintiffs sought damages for the extraordinary costs of caring for Timothy during his minority and during his majority, as well as for lost wages.

The trial court determined plaintiffs could only recover damages for the extraordinary costs of caring for Timothy during his minority and could not recover damages for the extraordinary costs of caring for Timothy during his majority. Pursuant to section 2—615 of the Code of Civil Procedure (the Code) (735 ILCS 5/2—615 (West 2006)), the trial court dismissed those portions of plaintiffs' third-amended complaint alleging negligent infliction of emotional distress and those counts seeking damages for plaintiffs' lost wages and the extraordinary medical expenses for caring for Timothy during his majority. Plaintiffs then voluntarily dismissed the remainder of their third-amended complaint (the portion alleging damages for the extraordinary expenses of caring for Timothy during his minority) because, based on a previous settlement with other medical personnel, all damages that could be obtained at trial against Doctor Burton and Children's Memorial Hospital would be completely offset by the settlement amount.

Plaintiffs filed this timely appeal of the order dismissing all claims in their third-amended complaint for extraordinary expenses of caring for Timothy during his majority, damages for emotional distress, and damages for lost wages.

The question presented by a section 2—615 motion to dismiss is whether the allegations of the complaint, viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 391 (1999). A cause of action will not be dismissed on the pleadings unless no set of facts can be proved that will entitle the plaintiff to recover. *Abbasi*, 187 Ill. 2d at 391. Review is *de novo*. *Abbasi*, 187 Ill. 2d at 391.

This appeal does not require the appellate court to make any determinations as to the liability of defendants Doctor Burton or Children's Memorial Hospital. Rather, this appeal only challenges the trial court's ruling regarding the availability of certain damages.

■ First, plaintiffs contend the trial court erred in determining plaintiffs could not recover damages in their wrongful birth case for the extraordinary expenses of caring for Timothy during his majority. We begin our analysis by discussing *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230 (1987), in which our supreme court recognized a claim for "wrongful birth."

In *Siemieniec*, Janice Siemieniec became pregnant in February 1980 and was concerned about the possibility that her baby might be born with hemophilia because two of her cousins were afflicted with that disease. *Siemieniec*, 117 Ill. 2d at 231. She sought genetic counseling at Lutheran General Hospital, where Doctor Carol Booth informed her of the availability of prenatal genetic diagnostic tests to determine the risk of the baby being born with hemophilia. *Siemieniec*, 117 Ill. 2d at 232. Mrs. Siemieniec purportedly told Doctor Booth of her desire to abort the pregnancy if there was a substantial risk of her bearing a hemophilic child. *Siemieniec*, 117 Ill. 2d at 232.

Doctor Booth referred Mrs. Siemieniec to Doctor Juan Chediak at Michael Reese Hospital. Doctor Chediak gave Mrs. Siemieniec the same advice regarding testing, and he promised to check on whether her cousins were registered hemophiliacs and to examine her deceased cousin's death certificate. *Siemieniec*, 117 Ill. 2d at 232. Two weeks later, Doctor Chediak sent a letter to Doctor Booth stating that Mrs. Siemieniec had a very low risk of being a carrier of classic hemophilia. *Siemieniec*, 117 Ill. 2d at 232. Doctor Booth sent a copy of the letter to Mrs. Siemieniec. *Siemieniec*, 117 Ill. 2d at 232. Based on this information, the Siemieniecs proceeded with the pregnancy. *Siemieniec*, 117 Ill. 2d at 232. Adam Siemieniec was born in October 1980 and later diagnosed with hemophilia. *Siemieniec*, 117 Ill. 2d at 233.

The Siemieniecs filed a complaint against Doctor Booth, Doctor Chediak, Lutheran General Hospital, and Michael Reese Hospital. *Siemieniec*, 117 Ill. 2d at 233. The complaint alleged that, as a proximate result of defendants' negligent diagnosis and failure to accurately advise Mrs. Siemieniec of the risk of the child being born a hemophiliac, Adam Siemieniec was not aborted, to his personal injury and to the financial injury of his parents. *Siemieniec*, 117 Ill. 2d at 233.

The trial court denied defendants' motions to dismiss, and the case eventually was appealed to the supreme court. *Siemieniec*, 117 Ill. 2d at 233-34. The pertinent issues before the supreme court were whether the child has a cause of action on his own behalf for

extraordinary medical expenses during the age of majority and whether the parents have a cause of action for the extraordinary medical expenses of the hemophilic child during his minority. *Siemieniec*, 117 Ill. 2d at 233.

The supreme court began its analysis by examining whether actions for "wrongful life" and "wrongful birth" should be recognized in Illinois. With regard to "wrongful birth," the court stated:

" 'Wrongful birth' refers to the claim for relief of parents who allege they would have avoided conception or terminated the pregnancy by abortion but for the negligence of those charged with prenatal testing, genetic prognosticating, or counseling parents as to the likelihood of giving birth to a physically or mentally impaired child. The underlying premise is that prudent medical care would have detected the risk of a congenital or hereditary genetic disorder either prior to conception or during pregnancy. As a proximate result of this negligently performed or omitted genetic counseling or prenatal testing, the parents were foreclosed from making an informed decision whether to conceive a potentially handicapped child or, in the event of a pregnancy, to terminate the same." *Siemieniec*, 117 Ill. 2d at 235.

With regard to "wrongful life," the supreme court stated:

"The corresponding action by or on behalf of an infant who suffers from a genetic or congenital disorder is denominated one for 'wrongful life.' The child claims that the physician or other healthcare provider: (1) failed to accurately perform genetic screening tests prior to conception or to correctly inform the prospective parents of the hereditary nature of certain genetic disorders; (2) failed to accurately advise, counsel, or test his parents during pregnancy concerning genetic or teratogenic risks associated with childbirth suggested by maternal age, physical condition, family medical history, or other circumstances particular to the parents; or (3) failed to perform a surgical procedure intended to prevent the birth of a congenitally or genetically defective child. *** The essence of the child's claim is that the medical professional's breach of the applicable standard of care precluded an informed parental decision to avoid his conception or birth. But for this negligence, the child allegedly would not have been born to experience the pain and suffering attributable to his affliction." *Siemieniec*, 117 Ill. 2d at 236.

The supreme court refused to recognize a cause of action for "wrongful life," as it was unwilling to hold either that a child can recover damages for achieving life or that a child has suffered a legally cognizable injury by being born with a congenital or genetic impairment as opposed to not being born at all. *Siemieniec*, 117 Ill. 2d at

238-48. The supreme court further held "the public policy of this State to protect and to preserve the sanctity of all human life, as expressed in section 1 of the Illinois Abortion Law of 1975, militates against the judgment that an individual life is so wretched that one would have been better off not to exist." *Siemieniec*, 117 Ill. 2d at 251.

The supreme court next considered the Siemieniecs' claim for "wrongful birth," in which they alleged that they were tortiously injured because Mrs. Siemieniec was deprived of the option of making an informed decision either to abort the fetus or give birth to a potentially genetically defective child. *Siemieniec*, 117 Ill. 2d at 253. The supreme court noted that the courts which have considered such wrongful birth claims have been "almost unanimous" in recognizing such a cause of action. *Siemieniec*, 117 Ill. 2d at 256. The supreme court further noted that judicial acceptance of wrongful birth claims has been premised on a number of rationales, including: the theory that wrongful birth claims are "a logical and necessary extension of existing principles of tort law"; that wrongful birth claims "vindicate[ ] the societal interest in reducing and preventing the incidence of [genetic] defects"; that to refuse to recognize wrongful birth claims would "frustrate" the policies of tort law to compensate the victim, deter negligence, and encourage due care; and to refuse to recognize wrongful birth claims would "impermissibly burden the constitutional rights involved in conception, procreation, and other familial decisions." *Siemieniec*, 117 Ill. 2d at 257-58.

The supreme court held, the "great weight of authority *** forces [it] to agree with the majority of the courts and the legal commentators and to hold that an action for the wrongful birth of a genetically or congenitally defective child may be maintained by the parents of such child." *Siemieniec*, 117 Ill. 2d at 258.

The supreme court next considered the element of damages that may be recovered by the parents. The supreme court noted that most courts that have recognized a cause of action for wrongful birth have limited damages to the extraordinary expenses attendant to the care and treatment of the disabled child and have not included expenses associated with the raising of a healthy child. *Siemieniec*, 117 Ill. 2d at 259. The supreme court held that it aligned itself "with the majority of jurisdictions which have limited the parents' recovery of damages to the extraordinary expenses—medical, hospital, institutional, educational and otherwise—which are necessary to properly manage and treat the congenital or genetic disorder." *Siemieniec*, 117 Ill. 2d at 260.

Importantly for the purposes of the present case, the supreme court emphasized that the Siemieniecs sought to recover "only those

extraordinary expenses that will be incurred *prior* to the child's reaching his majority." (Emphasis in original.) *Siemieniec*, 117 Ill. 2d at 260. Thus, the supreme court did not address the pertinent issue here, specifically, whether plaintiffs may recover damages in a wrongful birth action for the extraordinary costs of caring for their unemancipated, disabled son beyond the age of majority.

In the absence of any case law addressing whether plaintiffs may recover damages in a wrongful birth action for the extraordinary costs of caring for their unemancipated, disabled son beyond the age of majority, the parties look to Illinois statutory law for guidance. Plaintiffs cite section 15(a)(1) of the Rights of Married Persons Act, commonly referred to as the family expense statute, which states:

> "The expenses of the family and of the education of the children shall be chargeable upon the property of both husband and wife, or of either of them, in favor of creditors therefor, and in relation thereto they may be sued jointly or separately." 750 ILCS 65/15(a)(1) (West 2006).

Plaintiffs contend they will be obligated to provide for the extraordinary costs of Timothy's postmajority medical care under the family expense statute, and they should be allowed to recover said costs from defendants.

Defendants counter that the family expense statute does not obligate parents to support their children after they reach the age of majority. Defendants contend that since plaintiffs have no legal liability for Timothy's postmajority costs under the family expense statute, recovery for such costs is not allowable. Defendants cite *Tully v. Cuddy*, 139 Ill. App. 3d 697 (1985), and *Ragan v. Protko*, 66 Ill. App. 3d 257 (1978), which held that once a child has reached the age of majority, his parents are not liable for his medical bills under the family expense statute. *Tully* and *Ragan* held that for parents to recover for their child's medical expenses, they must be legally liable for the charges, and the basis for such liability must exist prior to the creation of the charges and not arise due to a voluntary assumption of financial responsibility after the fact. *Ragan*, 66 Ill. App. 3d at 261; *Tully*, 139 Ill. App. 3d at 699.

Defendants further argue that no Illinois statute requires parents to support their children after they reach the age of majority, even if the children are disabled and unemancipated. Defendants contend that in the absence of any statutory obligation to provide for Timothy's extraordinary, postmajority medical expenses, any payment by plaintiffs for such expenses are a voluntary assumption of financial responsibility for which defendants may not be held liable.

However, plaintiffs correctly respond that parents properly may be ordered to provide support of an unemancipated, disabled adult child pursuant to section 513(a)(1) of the Illinois Marriage and Dissolution of Marriage Act. Section 513(a)(1) states:

"(a) The court may award sums of money out of the property and income of either or both parties or the estate of a deceased parent, as equity may require, for the support of the child or children of the parties who have attained majority in the following instances:

(1) When the child is mentally or physically disabled and not otherwise emancipated, an application for support may be made before or after the child has attained majority." 750 ILCS 5/513(a)(1) (West 2006).

Thus, in section 513(a)(1), the legislature refused to foreclose all parental support for an unemancipated, disabled child after the age of majority, but instead allowed the trial court to determine "as equity may require" whether to award sums of money from the parties in a dissolution proceeding for the support of the disabled child. 750 ILCS 5/513(a)(1) (West 2006). Section 513(a)(1) reflects the legislative intent that the trial court consider the unique challenges and needs of mentally and physically disabled children on a case-by-case basis in determining whether to award moneys for the support thereof into their majority.

Although the present case is not a dissolution proceeding, section 513(a)(1) is relevant here in that it demonstrates the legislature's reluctance to draw an arbitrary line at the age of majority in determining when support obligations for unemancipated, disabled children must cease; rather, as discussed, the legislature determined that support obligations for an unemancipated, disabled child over the age of majority must be made on a case-by-case basis.

We see no cause why a different set of rules should apply here, in a nondissolution proceeding, and instead follow the lead of the General Assembly in refusing to automatically foreclose damages in a wrongful birth case for the extraordinary costs of caring and supporting an unemancipated, disabled child beyond the age of majority.

Defendants contend our holding will have negative, far-reaching implications in Illinois. Defendants contend:

"First, if the law requires parents to 'own' the obligation for adult care of their unwanted, disabled child, the same obligation would have to extend to all parents of disabled children: there is simply no reason to obligate parents of *unwanted* children to pay these costs without recognizing the same obligation for parents of wanted children. Under such a regime, the parents' legal liability for these costs would rationally imply that the child would have no

basis to recover them on his own, even in ordinary negligence cases where children have been entitled to recover for their medical expenses for decades. When the recovery is the parent's, there is no legal obligation or duty to spend the money for the benefit of the child.

Second, judicial recognition of a parental obligation to pay for the expenses incurred by adult disabled children would lead to a flood of litigation whereby individuals and businesses who provide uncompensated or under-compensated care for adults with disabilities proceed against the parents of those individuals on the basis that the parents have an independent obligation to pay these costs. Such results would constitute a paradigm shift in the law of Illinois. The legislature has never expressed an intention to reach these results, and such results would be unthinkable." (Emphasis in original.)

Defendants' arguments are unavailing, as we are *not* holding that parents always "own" the obligation for adult care of their disabled child, nor are we holding that medical providers have a cause of action against the parents of disabled children over the age of majority. Rather, our holding here is limited to answering "yes" to the question of whether plaintiffs may plead a cause of action for wrongful birth against a tortfeasor to recover damages for the extraordinary costs of caring for their unemancipated, disabled child beyond the age of majority.

Defendants contend plaintiffs should not be allowed to recover in wrongful birth the damages that Timothy is precluded from recovering in wrongful life. As discussed above, the supreme court refused to recognize a cause of action for wrongful life because it was unwilling to hold that a child can recover damages for achieving life or that a child has suffered a legally cognizable injury by being born with an impairment as opposed to not being born at all. *Siemieniec*, 117 Ill. 2d at 238-48. These principles are not implicated by an award in a wrongful birth case for the extraordinary costs of caring for an unemancipated, disabled child beyond the age of majority. Such an award does not constitute damages for achieving life, nor does it constitute a recognition or admission the child would have been better off never having been born; rather, the damages rightfully compensate the parents for the costs they will incur for caring for their disabled child.

In the present case, counts II, V, X, and XIII of plaintiffs' third-amended complaint adequately plead a cause of action for wrongful birth by alleging Amy Clark would have avoided conceiving her second son Timothy but for the negligence of defendants with regard to their failure to obtain the UBE3A sequence analysis and their failure to inform her that Timothy would have a 50% chance of being born with

Angelman Syndrome. Counts II, V, X, and XIII of plaintiffs' third-amended complaint also adequately allege damages for the extraordinary expenses plaintiffs will incur to care and support Timothy throughout his majority. Specifically, plaintiffs plead, as a disabled adult, Timothy will not be able to take care of himself in any way and will never be emancipated; plaintiffs will continue to care for Timothy into his majority; and plaintiffs have incurred and will continue to incur extraordinary expenses necessary to properly manage and treat Timothy's Angelman Syndrome throughout his majority.

Accordingly, we reverse the order of the circuit court dismissing counts II, V, X, and XIII of plaintiffs' third-amended complaint and remand for further proceedings.

■ Next, we address the dismissal of counts VII, VIII, XV, and XVI, which allege negligent infliction of emotional distress against defendants. Prior to *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546 (1983), the supreme court adhered to the so-called "impact" rule in determining whether damages for negligent infliction of emotional distress could be recovered by the direct victims of defendants' negligence and by the bystanders to defendants' negligent act. Pursuant to the impact rule, direct victims and bystanders could recover damages if they suffered emotional distress and a "contemporaneous physical injury or impact." *Rickey*, 98 Ill. 2d at 553.

In *Rickey*, the supreme court abandoned its adherence to the impact rule in bystander cases, stating:

"The standard that we substitute for the one requiring contemporaneous injury or impact is the standard which has been adopted in the majority of jurisdictions where this question of recovery by a bystander for emotional distress has been examined. [Citations.] That standard has been described as the zone-of-physical-danger rule. Basically, under it a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress. This rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact. The bystander, as stated, must show physical injury or illness as a result of the emotional distress caused by the defendant's negligence." *Rickey*, 98 Ill. 2d at 555.

In *Siemieniec*, the supreme court applied the zone-of-physical-danger rule articulated in *Rickey*. The Siemieniecs alleged negligent infliction of emotional distress in connection with their son's birth with hemophilia. *Siemieniec*, 117 Ill. 2d at 260-61. The supreme court

held that to state such a cause of action, the Siemieniecs must plead that they fall within the zone-of-physical-danger rule for bystanders. *Siemieniec*, 117 Ill. 2d at 260-62. The supreme court held:

"[U]nder the holding of *Rickey*, before a plaintiff can recover for negligently caused emotional distress, he must have, himself, been endangered by the negligence, and he must have suffered physical injury or illness as a result of the emotional distress caused by the defendant's negligence.

There are no allegations in the complaint from which it can be said that the defendants' alleged negligence in any way endangered the parents of the impaired child. It is also not alleged that the parents have or will suffer any physical injury or illness resulting from the emotional distress allegedly caused by defendants' negligence." *Siemieniec*, 117 Ill. 2d at 261.

Accordingly, the supreme court held the Siemieniecs had no cause of action for negligent infliction of emotional distress. *Siemieniec*, 117 Ill. 2d at 262-63.

In contrast to *Siemieniec*, plaintiffs in the present case have pleaded they are subject to physical pain, exhaustion, and emotional distress from caring for their son Timothy, who has Angelman Syndrome; they are subject to "hitting, biting, and physical trauma" while caring for Timothy; and they are thus within the zone-of-physical-danger caused by defendants' alleged negligence.

Plaintiffs have adequately pleaded that they fall within the zone-of-physical-danger rule and therefore have stated a cause of action for negligent infliction of emotional distress. We reverse the order of the circuit court dismissing counts VII, VIII, XV, and XVI of plaintiffs' third-amended complaint and remand for further proceedings.

■ Next, we address the dismissal of counts III, VI, XI, and XIV of plaintiffs' third-amended complaint, which allege damages for lost wages. In their appellate brief, plaintiffs contend, if they "are barred from seeking damages stemming from the extraordinary expenses associated with caring for Timothy beyond the age of majority, Jeff or Amy will be required to stay home and supervise and care for Timothy themselves." In their reply brief, plaintiffs state, if they "are not permitted to seek damages for the costs of caring for Timothy beyond the age of 18, they will incur lost wages damages because they will care for Timothy themselves."

As discussed earlier in this opinion, plaintiffs are permitted to seek damages for the extraordinary costs of caring for Timothy beyond the age of majority. As recognized by plaintiffs in their appellate briefs, any recovery for lost wages would be duplicative to the damages for the extraordinary costs of caring for Timothy beyond the age of major-

ity. Accordingly, we affirm the dismissal of counts III, VI, XI, and XIV of plaintiffs' third-amended complaint.

■ Finally, defendants contend the trial court's dismissal of plaintiffs' third-amended complaint pursuant to section 2—615 of the Code should be affirmed on the basis that plaintiffs failed to file their claims against defendants within the two-year statute of limitations for medical negligence actions. See 735 ILCS 5/13—212(a) (West 2006). Defendants' limitation defense is not properly before us, as defendants cite evidence outside the complaint in support thereof. Evidence outside the complaint may not be considered when ruling on a section 2—615 motion to dismiss. *Visvardis v. Eric P. Ferleger, P.C.*, 375 Ill. App. 3d 719, 723 (2007).

For the foregoing reasons, we reverse the order dismissing counts II, V, VII, VIII, X, XIII, XV, and XVI of plaintiffs' third-amended complaint and remand for further proceedings; we affirm the order dismissing counts III, VI, XI, XIV.

This case presents perplexing issues over which many will differ, as we have differed from the able and learned trial judge here. We are mindful of the gravity of our words and this holding and we are eager for our supreme court and General Assembly to address these issues.

Affirmed in part and reversed in part; cause remanded.

STEELE, J., concurs.

JUSTICE GALLAGHER, specially concurring:

I write to concur with the majority and to make one succinct point: We believe very simply that it is the public policy of this state to allow parents of a permanently disabled child to allege and prove damages for the costs of caring for the child after reaching majority. The parents have a right to allege and seek to prove an action against tortfeasors, rather than have to assume personally the costs of providing for the child's lifelong needs. Moreover, we believe it is preferable for the alleged tortfeasors to pay these costs, if found liable, than for the taxpayers to be required to assist in paying them.

In short, if there is a tortfeasor, that person should bear the burden he, she or it caused rather than the parents or society. If we are incorrect about our assumption regarding the state's public policy, it will be remedied through the legal or political process. Before that occurs, we think the approach we have chosen is a rational one.