# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Clark v. Children's Memorial Hospital*, 2011 IL 108656

---

| | |
|---|---|
| Caption in Supreme Court: | AMY CLARK *et al.*, Appellees, v. THE CHILDREN'S MEMORIAL HOSPITAL *et al.*, Appellants. |
| Docket No. | 108656 |
| Filed | May 6, 2011 |
| Rehearing denied | September 26, 2011 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where parents asserted the tort of wrongful birth, their claim for the expenses of caring for their disabled child after he reached the age of majority was properly dismissed because the common law and statutes of Illinois do not require parents to support their children after they reach the age of majority; and, because the supreme court concluded here that the zone-of-danger test should not apply to plaintiffs who seek compensation for emotional distress as an element of damages for the tort of wrongful birth, the plaintiffs should be allowed, on remand, to amend their pleadings after they had initially sought damages for negligent infliction of emotional distress under the zone-of-danger rule. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Thomas L. Hogan, Judge, presiding. |
| Judgment | Judgment affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Gary Feinerman and Andrianna Kastanek, of Sidley Austin LLP, and Pamela L. Gellen and Deborah M.R. O'Brien, of Lowis & Gellen LLP, all of Chicago, for appellants.

Christopher T. Hurley, Mark McKenna and Evan M. Smola, of Hurley McKenna & Mertz, P.C., of Chicago, for appellees.

Thaddeus J. Nodzenski and Mark D. Deaton, of Naperville, for *amicus curiae* Illinois Hospital Association.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, of Chicago (Michael L. Vittori and Melissa A. Murphy-Petros, of counsel), for *amicus curiae* Fertility Centers of Illinois, S.C.

Mark D. Prince and Andrew W. Wilson, of Marion, for *amicus curiae* Illinois Trial Lawyers Association.

Justices

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas, Karmeier, Burke, and Theis concurred in the judgment and opinion.

Justice Freeman concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Plaintiffs, Amy and Jeff Clark, individually and on behalf of their minor son, Timothy, filed a 16-count complaint against several defendants. Their claims included wrongful birth and negligent infliction of emotional distress. The circuit court of Cook County ruled that the damages available in a wrongful-birth action do not include the extraordinary costs of caring for a disabled child after he reaches the age of majority. The circuit court also dismissed plaintiffs' claim for negligent infliction of emotional distress. Having already reached a settlement with other defendants, plaintiffs voluntarily dismissed the remaining counts against the remaining defendants, Children's Memorial Hospital and Dr. Barbara Burton, and the circuit court dismissed the case with prejudice.

¶ 2    The appellate court held that plaintiff parents in a wrongful-birth case may recover

damages for the cost of caring for their dependent,[1] disabled, adult child and that the plaintiffs in this case had adequately pleaded a cause of action for negligent infliction of emotional distress. 391 Ill. App. 3d 321. Defendants filed a petition for leave to appeal pursuant to Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. Oct. 15, 2007)), which we allowed. We also allowed Fertility Centers of Illinois, S.C., the Illinois Hospital Association, and the Illinois Trial Lawyers Association to file briefs as *amici curiae* pursuant to Supreme Court Rule 345 (Ill. S. Ct. R. 345 (eff. Dec. 6, 2005)).

¶ 3    For the reasons that follow, we affirm the judgment of the appellate court in part and reverse in part.

¶ 4                                   BACKGROUND

¶ 5    Plaintiffs Amy and Jeff Clark filed suit against Paul Wong, M.D., Rush University Medical Center (Rush), Baylor University Medical Center (Baylor), and Quest Diagnostics Clinical Laboratories (Quest), alleging various theories of liability in connection with the birth of their son, Timothy, who has Angelman Syndrome.[2] They later added Children's Memorial Hospital (Children's Memorial) and Barbara Burton, M.D., as defendants. Their amended complaint alleged that Burton negligently failed to inform plaintiffs of test results revealing that their first son, Brandon, suffered from Angelman Syndrome due to a UBE3A genetic mutation, and that they would not have conceived Timothy had she provided them with accurate information regarding the risk of giving birth to another child with the same condition.

¶ 6    According to the complaint, Brandon, who was born in 1997, began exhibiting developmental delays when he was about 15 months old. In 2000, plaintiffs sought genetic testing and counseling from Dr. Wong, a geneticist at Rush, to determine whether Brandon suffered from Angelman Syndrome, a condition that may be, but is not always, caused by an inherited gene mutation. Dr. Wong ordered a genetic sequencing test, which was performed by Baylor on a blood sample drawn by Quest. Dr. Wong later reported to the plaintiffs that Brandon's condition was "clinical" in nature and was not caused by a genetic abnormality.

¶ 7    Nevertheless, before conceiving another child, Amy sought a second opinion from Dr. Burton, a geneticist at Children's Memorial, to determine if Brandon suffered from Angelman Syndrome due to the UBE3A gene mutation. In 2001, without first obtaining the results of the gene sequencing test performed at Baylor or ordering another test, Dr. Burton informed Amy that all known genetic mechanisms that might have caused Angelman

---

[1]The parties refer to a "disabled, unemancipated adult child." Because emancipation applies to minors (see 750 ILCS 30/1 *et seq.* (West 2006)), and not to adults, we will use the more precise term "dependent" to refer to an adult who is incapable of self-support due to a mental or physical disability.

[2]Angelman Syndrome is a congenital condition of faulty body development marked by growth deficiency, mental retardation, eye disorders, jerky arm movements, and gait resembling that of a puppet. 1 Attorneys' Dictionary of Medicine A-351 (2005).

Syndrome in Brandon had been ruled out.

¶ 8     The information provided to the plaintiffs by Drs. Wong and Burton, however, was incorrect. Baylor's genetic sequencing analysis of Brandon's DNA indicated that he suffered from Angelman Syndrome due to a truncating mutation of the UBE3A gene. If further testing had been ordered based on this result, it would have revealed whether the mutation was *de novo* or hereditary, that is, whether it was a random occurrence in Brandon's genes or an inherited mutation.

¶ 9     Lacking accurate and complete information and relying on Dr. Burton's conclusion that all known mechanisms for identifying the UBE3A gene mutation linked to Angelman Syndrome ruled out the mutation as the cause of Brandon's condition, the Clarks conceived another child.

¶ 10    In March 2002, Amy gave birth to Timothy. In June 2002, she observed that Timothy exhibited jerky and unpredictable motor movements, among other symptoms similar to Brandon's.

¶ 11    On September 30, 2002, after repeated unsuccessful attempts to obtain the results of the UBE3A sequencing analysis from Dr. Wong, Amy contacted Baylor to request a copy of the report. The Baylor staff member to whom she spoke explained that because testing was performed under contract with the requesting physician, test results were released only to the physician, not to the patient. However, the staff member also mentioned that the results of Brandon's genetic sequencing test were "abnormal."

¶ 12    The report, which was eventually obtained through the efforts of counsel, concluded that Brandon's UBE3A gene was truncated and that further testing was needed to determine if Amy was a carrier of the abnormal gene. Dr. Burton acknowledged that later testing has revealed that Timothy's mutation was inherited from Amy and that had she obtained the test result from Baylor, she would have counseled plaintiffs differently.

¶ 13    Timothy, like his brother Brandon, was diagnosed with Angelman Syndrome.

¶ 14    In September 2003, plaintiffs filed their initial wrongful-birth complaint, which was amended several times. The first amended complaint, filed on September 7, 2004, added Dr. Burton and Children's Memorial as defendants. Plaintiffs later voluntarily dismissed Baylor and reached settlements with Wong, Rush, and Quest.

¶ 15    In 2006, Dr. Burton and Children's Memorial–by then the only remaining defendants–moved for summary judgment on the ground that plaintiffs failed to bring suit against them within the two-year limitations period set forth in section 13-212 of the Code of Civil Procedure (735 ILCS 5/13-212 (West 2006)). The circuit court denied the motion, reasoning, in part, that there was "at least a question of fact" as to when the statute was triggered and the limitations period began to run.

¶ 16    Plaintiffs subsequently filed their third amended complaint in 2008, seeking damages for wrongful birth consisting of the extraordinary costs of caring for Timothy during his minority, the extraordinary costs of caring for him after he reaches the age of majority, and his lost wages. In support of their claim for the extraordinary costs of caring for Timothy during his majority, plaintiffs alleged that Timothy "is and always will be mentally disabled," that Angelman Syndrome is a "permanent genetic disorder with no chance of ever being

-4-

cured," and that Timothy has "no chance of leading an independent life as an adult or being emancipated." Plaintiffs further alleged that, as a disabled adult, Timothy "will not be able to care for himself in any way and will require substantial sums of money to sustain his life." As a result, plaintiffs "will continue to care for Timothy *** into his majority and will be legally liable for some or all of these costs because Timothy will never be emancipated."

¶ 17    Plaintiffs also sought damages for the separate tort of negligent infliction of emotional distress.

¶ 18    The circuit court ruled that plaintiffs could recover damages for the extraordinary costs of caring for Timothy during his minority, but could not recover damages for the extraordinary costs of caring for him after he reaches the age of majority. Pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2006)), the court dismissed those portions of plaintiffs' third amended complaint alleging negligent infliction of emotional distress and those counts seeking damages for Timothy's lost wages and the extraordinary medical expenses of caring for him during his majority. Because the only remaining claim, that seeking damages for the extraordinary expenses of caring for Timothy during his minority, would have been completely offset by the previous settlement with other defendants, plaintiffs voluntarily dismissed this claim. The circuit court dismissed the case with prejudice, stating there was no just reason to delay enforcement or appeal.

¶ 19    The appellate court affirmed in part and reversed in part, and remanded for further proceedings. 391 Ill. App. 3d 321. The court reversed the circuit court's dismissal of the counts seeking postmajority damages and the counts alleging negligent infliction of emotional distress. However, the appellate court affirmed the dismissal of the counts seeking damages for lost wages. According to the court, any recovery for lost wages would be duplicative of the damages for the extraordinary costs of caring for Timothy during his majority. The appellate court also declined to consider defendants' alternative argument that the dismissal of plaintiffs' complaint should be affirmed on statute of limitations grounds.

¶ 20                                    ANALYSIS

¶ 21    A motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2006)) challenges the legal sufficiency of the complaint by alleging defects on the face of the complaint. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004). In ruling on a section 2-615 motion, we accept as true all well-pleaded facts in the complaint and all reasonable inferences therefrom. *Vitro*, 209 Ill. 2d at 81. The critical inquiry is whether the allegations of the complaint, when construed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003); *Vitro*, 209 Ill. 2d at 81. We review an order granting a section 2-615 motion to dismiss *de novo*. *Wakulich*, 203 Ill. 2d at 228; *Vitro*, 209 Ill. 2d at 81.

¶ 22    In *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230, 258 (1987), this court recognized that the parents of a child born with a genetic or congenital disorder have a cause of action in tort if, but for the defendant's negligence in testing or counseling as to the risk of giving birth to a child with such a condition, they would have avoided conception or terminated the pregnancy. In *Siemienic*, the remedies sought by the plaintiff parents of a child

born with hemophilia, a bleeding disorder, included the extraordinary medical and other expenses involved in caring for the child during his minority and damages for their emotional anguish and suffering. *Id.* at 253.

¶ 23　This court allowed recovery of damages for "the extraordinary expenses–medical, hospital, institutional, educational and otherwise–which are necessary to properly manage and treat the congenital or genetic disorder," noting that the plaintiff parents were seeking to recover only such expenses as would be incurred prior to the child's reaching the age of majority. *Id.* at 260. This court also held that the parents could not recover damages for their emotional distress as an "element in the calculation of damages" for wrongful birth (*id.* at 261), because they could not state a claim for negligent infliction of emotional distress under the "zone-of-danger rule" (*id.* at 262-63).

¶ 24　Two issues raised by the defendants in this appeal involve the remedies available to successful plaintiffs in a wrongful-birth action. The first question–whether the parents may recover damages for the extraordinary expenses of caring for the disabled child after he reaches the age of majority–was not answered in *Siemieniec* because the parents in that case did not allege their child suffered from a condition that would cause him to be financially dependent as an adult. In the present case, the parents have alleged that their child's condition will make it impossible for him to be self-supporting as an adult. The second question–whether the parents may recover damages for emotional distress caused by the defendants' negligence–was answered in *Siemieniec* in the negative. Defendants also ask this court to review the circuit court's ruling on their motion for summary judgment based on the statute of limitations, which the appellate court did not consider.

¶ 25　　　　　　A. Damages for Costs of Care Beyond Age of Majority

¶ 26　The circuit court ruled that while the plaintiff parents in a wrongful-birth action may recover damages for the extraordinary costs of caring for their child during his minority, they may not recover damages for such costs after he reaches the age of majority. The appellate court reversed, holding that postmajority expenses are recoverable damages that compensate parents for the "costs they will incur for caring for their disabled child." 391 Ill. App. 3d at 330. In reaching this conclusion, the appellate court noted that in a dissolution proceeding, "support obligations for an unemancipated, disabled child over the age of majority" are determined on a case-by-case basis and thus found no basis for "automatically forclos[ing] damages in a wrongful birth case for the extraordinary costs of caring [for] and supporting an unemancipated, disabled child beyond the age of majority." *Id.* at 329. The concurring justice explained that public policy favors imposing these costs on the tortfeasor, rather than on the parents or the taxpayers, and suggested that if this assumption regarding public policy is incorrect, the error will be corrected through the legal or the political process. *Id.* at 333 (Gallagher, J., specially concurring).

¶ 27　Before this court, defendants argue that because parents have no legal obligation to support a child beyond the age of majority, parents in a wrongful-birth suit may not recover damages for postmajority expenses.

¶ 28　Plaintiffs assert four separate bases for allowing such damages. First, they argue that they

may be held liable for Timothy's postmajority expenses under Illinois common law and, as a result, they may recover damages from the tortfeasor whose negligence resulted in their liability. Second, they argue that Illinois statutory law supports the same result. Third, they rely on decisions from other jurisdictions allowing plaintiff parents in wrongful-birth cases to recover postmajority expenses as an element of damages and urge this court to follow the reasoning of these cases. Fourth, they assert that the public policy of the State of Illinois supports holding the tortfeasor responsible for these foreseeable costs.

¶ 29   We begin our analysis with the fundamental premise of tort law–that of just compensation for any loss or injury proximately caused by the tortfeasor. See *Siemieniec*, 117 Ill. 2d at 259. Damages are recoverable to the extent necessary to place the injured party in the position he would have occupied if the wrong had not been committed. *Genslinger v. New Illinois Athletic Club of Chicago*, 339 Ill. 426, 443 (1930). See also *Wilson v. The Hoffman Group, Inc.*, 131 Ill. 2d 308, 321 (1989) (stating that it is well settled under our precedent that "[t]he purpose of compensatory tort damages is to compensate the plaintiff for his injuries, not to punish defendants or bestow a windfall upon plaintiffs"); *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 406 (1997) ("[t]here is universal agreement that the compensatory goal of tort law requires that an injured plaintiff be made whole"); Restatement (Second) of Torts § 903, cmt. a, at 453-54 (1979) ( "compensatory damages are designed to place [a plaintiff] in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed").

¶ 30   Thus, the plaintiffs' ability to recover damages for the extraordinary expenses of caring for their son after he reaches the age of majority depends on whether parents have an obligation under Illinois law to support a disabled, dependent adult child. If they have no such obligation, these expenses are not legal harms suffered by the parents, despite their commitment to care for their son throughout his life and their willingness to assume these costs voluntarily.

¶ 31   The appellate court recognized this requirement, noting that for parents to recover from a tortfeasor for their child's medical expenses, "they must be legally liable for the charges, and the basis for such liability must exist prior to the creation of the charges and not arise due to a voluntary assumption of financial responsibility after the fact." 391 Ill. App. 3d at 328 (citing *Tully v. Cuddy*, 139 Ill. App. 3d 697, 699 (1985)). The question for this court, therefore, is whether Illinois law imposes such an obligation.

¶ 32                                        1. *Common Law*

¶ 33   The generally accepted common law rule is that parents have no obligation to support their adult children. *People v. Hill*, 163 Ill. 186, 189 (1896) ("The duty of parents to provide for the maintenance of their children is a principle of natural law; but the common law does not, like the civil law, fully enforce this mere moral obligation, but simply goes to the extent of requiring parents to support their offspring until they attain the age of maturity.").

¶ 34   Plaintiffs assert that the common law of Illinois recognizes an exception to this general rule for the support of an adult child who is physically or mentally incapacitated and incapable of supporting himself. We find, however, that the history of our common law

-7-

reveals that the generally accepted common law rule is the law of Illinois, with specific, narrow exceptions that have since been codified by statute.

¶ 35     According to plaintiffs, the earliest reported Illinois decision discussing the issue of postmajority support is *Plaster v. Plaster*, 47 Ill. 290 (1868). Twelve years after the wife obtained a divorce on the grounds of desertion, she sought support for the son, who had been three years old at the time of the divorce and for whom the father had not, in the intervening years, provided any financial support. This court said that "[a]fter the boy became able to earn a support, in whole or in part, the father was not bound to maintain him in idleness, but only to contribute and pay for such portion as the child could not earn by reasonable effort." *Id.* at 293. Because the record did not reveal the boy's situation, "it would be proper to ascertain what the boy has been capable of earning for his own support, and if that would have been insufficient, then the remainder which was necessary should be ascertained and allowed." *Id.* Further, "[i]f the boy has attained an age that he is capable of supporting himself," the court would not require the father to contribute to his support. *Id.* at 294. If, however, "from physical debility and impaired health, the boy is unable to earn a livelihood, and must depend upon others for support, who should more naturally contribute to that end than his father?" *Id.*

¶ 36     The issue in *Plaster* was not whether a parent is obliged to support a disabled adult child. The issue was whether the mother, who had originally been awarded custody of the son, but no support, could return to court years later seeking a support order. This court ruled that the child, then in his teens, was entitled to support from his father to the extent that he was unable to support himself. The court noted that if he were incapable of supporting himself, his father should do so. The decision made no mention of what obligation either parent might have had once the child reached the age of majority. *Plaster*, therefore, offers little support for plaintiffs' position.

¶ 37     Plaintiffs also rely on *Freestate v. Freestate*, 244 Ill. App. 166 (1927), in which the appellate court was asked to determine whether a divorced father could be ordered to pay support for a 23-year-old invalid daughter. Although this appellate court decision has no binding authority in the trial court because it was filed before 1935 (see *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996)), it is of historical interest. The couple had divorced when the daughter was 13 and custody was given to the mother. No provision for child support was made at that time. *Freestate*, 244 Ill. App. at 167. The mother returned to court 10 years later, seeking support for the now-adult daughter. The appellate court ruled that the trial court had jurisdiction in the matter and had the authority to enter a support order despite the daughter's age. The court cited cases from the court of appeals of Kentucky (*Crain v. Mallone*, 113 S.W. 67 (Ky. 1908)) and the Supreme Court of Vermont (*Rowell v. Town of Vershire*, 19 A. 990 (Vt. 1890)) as a basis for concluding that the "natural, as well as the legal, obligation" is the same whether the child is an infant or an adult child who is "helpless and incapable of making his support." *Freestate*, 244 Ill. App. at 169-70.

¶ 38     *Freestate* was cited in a more recent case, *Strom v. Strom*, 13 Ill. App. 2d 354 (1957). The parents divorced when their daughter was three years old. She was subsequently stricken with polio, although the opinion does not state that she was disabled as a result. Ten years after the divorce, at which time she would have been 15, the mother sought an increase in

child support and reimbursement of various expenditures. *Id.* at 358. She also asked that the father be ordered to pay the reasonable expenses of a college education for the girl. The trial court denied this relief on the basis that it lacked jurisdiction. The appellate court examined cases from Illinois and other states and found nothing in the Divorce Act to specifically preclude an order providing for a child's education beyond the age of majority. *Id.* at 362. In the end, the court concluded that "[w]here such care and education are necessary to equip the child for adult life and where the financial circumstances of the father are entirely adequate to meet such requirements, equity can and should continue its jurisdiction." *Id.* at 364. The court observed that "[o]ne of the fundamental rules is that a court of equity having taken jurisdiction will retain it for all purposes and do complete justice between the parties." *Id.* at 367.

¶ 39    The *Strom* court rejected the reasoning of *Rife v. Rife*, 272 Ill. App. 404 (1933), that "by necessary implication" the Divorce Act did not permit an award of support beyond the child's minority. *Strom*, at 363 (citing *Rife*, 272 Ill. App. at 410). In *Rife*, the father appealed from an order that he continue to pay support for a 20-year-old daughter who had graduated from high school and from a business school but who, because she was "frail," could not secure employment. *Rife*, 272 Ill. App. at 406. Referring to the Divorce Act, the appellate court stated that the "rule is well established and generally recognized that the only authority a court of chancery has to provide for the care and support of children is the power granted under the terms of this statute, and that its power is limited by implication to the custody, support and care of minor children." *Id.* at 408. Further, the rule "is also well recognized that in the absence of a proceeding for divorce, a court of equity has no jurisdiction either as to the custody or support of children." *Id.* Thus, the court reversed that portion of the judgment awarding support for the adult daughter. *Id.* at 413.

¶ 40    In *Freestate* and in *Strom*, the appellate court allowed the trial court to exercise its equitable power to order a noncustodial father to contribute to the support of his adult child either because he was disabled or because she desired a college education. These cases do not stand for the general proposition that all parents, married or divorced, have an obligation to support an adult disabled child or to pay for a child's college education. They suggest, at most, that once parents submit to the jurisdiction of the court by obtaining a divorce, the court has discretion to order postmajority support in limited circumstances. Even this narrow principle, however, was not universally accepted, as demonstrated by the decision in *Rife*. In any event, subsequent legislative enactments have rendered these cases of little value in answering the question at bar.

¶ 41    We conclude that the common law as developed in cases through the late 1950s was in conflict regarding the obligation of parents to support a disabled adult child and that cases in which such support was awarded were limited to those in which a custodial parent sought support from a noncustodial parent following a divorce. In the middle of the last century, the issue became more and more one of statutory law.

¶ 42                              *2. Statutory Law*

¶ 43    A statutory exception to the generally accepted common law rule was made by the

Paupers Act of 1874, which provided that parents had the legal duty to support a child who was a "poor person *** unable to earn a livelihood in consequence of any bodily infirmity, idiocy, lunacy, or other unavoidable cause." Ill. Rev. Stat. 1874, ch. 107, § 1.

¶ 44     This statute was repealed in 1949, coincident with enactment of the Illinois Public Aid Code, which initially imposed a duty of support of adult children "in need and unable to earn a livelihood in consequence of any unavoidable cause." 1949 Ill. Laws 418, § 4-2. See Ill. Rev. Stat. 1955, ch. 23, ¶ 436-12; Ill. Rev. Stat. 1965, ch. 23, ¶ 112 (providing that "parents are severally liable for the support of any child *** 18 years of age or over whenever such child is unable to maintain himself and is, or is likely to become, a public charge").

¶ 45     This parental duty was substantially narrowed in 1967, when the Public Aid Code was amended to provide that parents were obligated to support an adult child over the age of 21 only if that child was blind or permanently disabled and two conditions were met. The child must have been "continuously dependent, in whole or in part, upon one or both of his parents" and he must have "continuously resided in the home of a parent" except for certain exempted temporary absences. 1967 Ill. Laws 2328, § 1.

¶ 46     Subsequent amendment of the Public Aid Code in 1969 eliminated any duty of parental support of nonminor children, even those who are disabled. Ill. Rev. Stat. 1969, ch. 23, ¶ 10-2.

¶ 47     The Public Aid Code presently provides that "parents are severally liable for the support of any child under age 18, and for any child aged 18 who is attending high school, until that child graduates from high school, or attains the age of 19, whichever is earlier." 305 ILCS 5/10-2 (West 2006).

¶ 48     Thus, although the legislature for a time imposed a parental support obligation to support dependent adult children, it abandoned that policy decades ago.

¶ 49     Other statutes are consistent with the generally accepted common law rule of no parental duty of support. Under the Mental Health and Developmental Disabilities Code, "responsible relatives" of a recipient of services from the Department of Mental Health "shall be liable for medical costs," excluding "service charges incurred by a child after the child reaches the age of majority." 405 ILCS 5/5-105, 5-115 (West 2006).

¶ 50     The Family Expense Act is a codification and expansion of common law doctrine of necessaries, under which a wife or minor child could obtain necessary goods or services on credit and the husband or father was liable, based on his duty to support his family. See, *e.g.*, *Hunt v. Thompson*, 4 Ill. 179, 180 (1840) ("[A] parent is under an obligation to provide for the maintenance of his infant children, is a principle of natural law; and it is upon this natural obligation alone that the duty of a parent to provide his infant children with the necessaries of life rests."); *Phillips v. Dodds*, 371 Ill. App. 3d 549, 551-52 (2007) (explaining that the Family Expense Act defines "family expenses" more broadly than mere "necessaries"). Under this statute, "[t]he expenses of the family *** shall be chargeable upon the property of both husband and wife, or of either of them, in favor of creditors therefor, and in relation thereto they may be sued jointly or separately." 750 ILCS 65/15(a)(1) (West 2006).

¶ 51     Judicial decisions interpreting this statute have consistently interpreted it as imposing an obligation on parents only until their child attains his majority. See, *e.g.*, *Proctor Hospital*

*v. Taylor*, 279 Ill. App. 3d 624, 628 (1996) ("[O]nce a child reaches the age of majority, the parents' responsibility to support the child ceases, and the parents may no longer be held liable for these expenses under the Expense Statute."); *Pfeil v. Weerde*, 152 Ill. App. 3d 759, 761 (1987) (holding that mother may not recover damages for her voluntary payment of medical expenses of 19-year-old daughter who lived at home; stating that "it is manifest that a parent is not liable under the [family expense] statute for expenses an adult child incurs"). See also *Sapp v. Johnston*, 15 Ill. App. 3d 119, 123-24 (1973) (father not liable for medical expenses of adult son under Public Aid Code, family expense statute, or the common law).

¶ 52    We note that we have found no reported cases construing the Family Expense Act that involve an adult child who was incapable of self-support due to a disability. However, nothing in the language of the statute suggests that it should be interpreted differently if the adult child were not capable of self-support. Excluding disabled adult children from the scope of the Family Expense Act is also consistent with the Public Aid Code and other statutory enactments.

¶ 53    Plaintiffs point to only one statute under which the parents of a disabled adult child may be required to contribute to his support–section 513 of the Illinois Marriage and Dissolution of Marriage Act, which is entitled "Support for Non-minor Children and Educational Expenses." 750 ILCS 5/513 (West 2006). Section 513(a)(1) of this statute provided the basis for the appellate court's conclusion:

> "(a) The court may award sums of money out of the property and income of either or both parties or the estate of a deceased parent, as equity may require, for the support of the child or children of the parties who have attained majority in the following instances:
>
> (1) When the child is mentally or physically disabled and not otherwise emancipated, an application for support may be made before or after the child has attained majority." 750 ILCS 5/513(a)(1) (West 2006).

¶ 54    The appellate court concluded in the present case that this statutory language "reflects the legislative intent that the trial court consider the unique challenges and needs of mentally and physically disabled children on a case-by-case basis in determining whether to award moneys for the support thereof into their majority." 391 Ill. App. 3d at 329. The court saw "no cause why a different set of rules should apply here, in a nondissolution proceeding." *Id.*

¶ 55    We do see a reason to apply a specific statutory rule in the context of a dissolution and a general common law rule in the context of determining damages for a common law tort. An examination of the history of section 513 is in order.

¶ 56    In 1967, the General Assembly amended what was then called the Divorce Act, adding the following language:

> "The court may, on application, from time to time, make such alterations in the allowance of alimony and maintenance, and the care, education, custody and support of the children, as shall appear reasonable and proper and the court has jurisdiction after such children have attained majority age to order payments for their support for educational purposes *only*." (Emphasis added.) 1967 Ill. Laws 3446, approved August 31, 1967 (codified at Ill. Rev. Stat. ch. 40, ¶ 19).

¶ 57    By expressly limiting the circumstances under which a court may order support after a child of divorced parents has "attained majority age," this statute abrogated any existing equitable doctrine that allowed courts to order support for adult children for any purpose other than education. Thus, *Freestate* and *Strom* were legislatively overruled. To the extent that *Plaster* provided any authority for imposing a postmajority support obligation, it was also rendered obsolete.

¶ 58    Then, in 1977, the General Assembly enacted the Illinois Marriage and Dissolution of Marriage Act. Section 513(a)(1), which was quoted by the appellate court's opinion, was added. Section 513(a)(2), which the appellate court did not reference, provides, in pertinent part:

> "(2) The court may also make provision for the educational expenses of the child or children of the parties, whether of minor or majority age, and an application for educational expenses may be made before or after the child has attained majority, or after the death of either parent. The authority under this Section to make provision for educational expenses extends not only to periods of college education or professional or other training after graduation from high school, but also to any period during which the child of the parties is still attending high school, even though he or she attained the age of 19." 750 ILCS 5/513(a)(2) (West 2006).

Further:

> "(b) In making awards under paragraph (1) or (2) of subsection (a), or pursuant to a petition or motion to decrease, modify, or terminate any such award, the court shall consider all relevant factors that appear reasonable and necessary, including:
>
> (1) The financial resources of both parents.
>
> (2) The standard of living the child would have enjoyed had the marriage not been dissolved.
>
> (3) The financial resources of the child.
>
> (4) The child's academic performance." 750 ILCS 5/513(b) (West 2006).

¶ 59    By enacting these provisions, the legislature expressly adopted two exceptions to the general rule of no parental obligation for the support of adult children. This statute, in effect, reinstates the equitable power of the court to do what was done in *Freestate* and *Strom*. See, *e.g.*, *In re Marriage of Raski*, 64 Ill. App. 3d 629, 632 (1978) (noting common law rule that parents' liability for child support terminates at the child's majority, with "certain statutory exceptions" found in the recently enacted Marriage and Dissolution of Marriage Act).

¶ 60    We conclude for several reasons that the history of section 513, viewed in light of the other legislative enactments discussed above, reveals that Illinois law does not impose an obligation on married parents to support a disabled child beyond the age of majority.

¶ 61    First, in light of the contrary provisions of the Public Aid Code, the Family Expense Act, and other statutes, section 513 standing alone does not reveal an overarching legislative policy to abrogate in other contexts the long-standing common law rule of no parental obligation to support an adult child. Rather, by adopting the two exceptions set out in section 513 in 1977, the legislature demonstrated its ability and intent to carve out exceptions to the

-12-

general rule when it desires to do so. It could impose a support obligation on the parents of disabled adult children in other contexts such as the Public Aid Code, the Family Expense Act, or the Mental Health and Developmental Disabilities Code, but has not chosen to do so.

¶ 62    Second, the clear intent of sections 513(a)(1) and (a)(2) is to provide the child of divorced parents who is unable to support himself due to a disability or who seeks higher education with the standard of living he would have enjoyed had his family remained intact. See *In re Marriage of Kuhn*, 221 Ill. App. 3d 1, 3-4 (1991) (stating that the purpose of section 513 "is to protect the interests of children whose parents have decided to dissolve their marriages"). Thus, in an intact family, the parents are free to decide, for their own reasons, whether they are willing or able to support an adult child, whatever his circumstances. See *id.*

¶ 63    Plaintiffs' brief notes that they are presently separated and could, at some future date, divorce, and one of them might seek support for Brandon and Timothy from the other under section 513(a)(1). This would be an application of the statute in the manner the legislature intended–to preserve, as much as possible, the benefits of an intact family for the children of divorce. However, if plaintiffs were to recover damages for Timothy's postmajority support and then divorce, these funds would be marital property, subject to division. Their expressed intent to place any such funds in a trust for Timothy is admirable, but is not something the court could order them to do.

¶ 64    Third, section 513 invokes the court's equitable powers. The child of divorced parents who seeks postmajority support due to a disability or to attend college is not entitled to receive such support. The court may, at its discretion and in the exercise of its equitable powers, impose a support obligation on either or both parents when such an obligation would not otherwise exist. In contrast, the issue in the present case is not whether, as a matter of equity, the court has the discretion to award damages to these parents for their child's postmajority expenses. This is an action in tort where the plaintiff parents must prove that they are entitled–as a matter of law–to the damages sought because they represent a cost for which they are legally responsible.

¶ 65    Finally, placing such significance on section 513 and ignoring the other statutes that limit parental responsibility to the support of minor children would lead to unintended results. For example, if this court were to hold in the present case that the plaintiff parents in a wrongful-birth action have a legal obligation to support their child after the age of majority, will that child have a claim on his parents' estate to the disadvantage of nondisabled siblings? And if the defendant is unable to pay the judgment and files for bankruptcy, will the parents be liable for the child's lifetime support? What if the damages awarded to the parents prove to be insufficient and are consumed by the time the child reaches the age of majority? Are his parents legally responsible for his future support? Or will parents who have a potential wrongful-birth claim against a negligent health care provider forgo bringing suit so that they may avoid having this new obligation thrust upon them?

¶ 66    We cannot foresee all of the potential effects that may flow from a decision by this court that section 513 creates a parental obligation of lifetime support of disabled children, even if the parents remain married to each other. Any effort on our part to limit application of such

a holding to those families in which the parents have obtained a judgment in a wrongful-birth action would be doomed to failure.

¶ 67 If the legislature prefers a different result that would place the burden of support on the tortfeasor rather than on the parents or the taxpayers, it could do so. Absent such legislative guidance, however, we conclude that under the common law and statutes of Illinois, parents are not obligated to support a child after he reaches the age of majority, even if he is unable to support himself, unless ordered to do so pursuant to section 513 of the Marriage and Dissolution of Marriage Act.

¶ 68                              3. *Case Law From Other States*

¶ 69 Defendants cite numerous cases from other states and argue that the "weight of authority" favors deciding this issue on the basis of whether state law imposes a general legal obligation of postmajority support on parents of disabled adult children. Because Illinois law does not impose such a legal obligation, defendants argue that we should follow the reasoning of these cases and conclude that postmajority damages may not be recovered in this case.

¶ 70 Plaintiffs also offer several decisions in wrongful-birth cases from our sister states and urge us to adopt a judge-made exception to the general rule of no duty of postmajority support in the context of a wrongful-birth claim.

¶ 71 We see no need to summarize here all of the cited case law from other states because our decision in *Siemieniec* provides the necessary framework. As plaintiffs note, we cited several cases from other states, noting that these states allow plaintiff parents in wrongful-birth actions to recover "the extraordinary costs incurred as a result of the child's affliction *after* the child has reached the age of majority" because "[t]hese courts reason that, under the common law, where a child is incapable of supporting himself because of physical or emotional disabilities, the parents' obligation to support continues beyond the child's age of majority." (Emphasis in original.) *Siemieniec*, 117 Ill. 2d at 260. By implication, we were suggesting that when the common law imposes a support obligation on parents, damages for postmajority support are recoverable in a wrongful-birth action. Conversely, where the common law does not impose such an obligation, such damages may not be recovered.

¶ 72 This is consistent with defendants' argument that, in general, in states that "impose a statutory or common law obligation on parents to care for dependent adult children, wrongful birth plaintiffs may recover postmajority expenses as damages." See, *e.g.*, *Viccaro v. Milunsky*, 551 N.E.2d 8, 11 (Mass. 1990) (parents are liable under state law for "the support of an adult child if the child is physically or mentally impaired and incapable of supporting himself"). However, in states where state law establishes that a parent has no postmajority duty of support, even to a disabled child, wrongful-birth plaintiffs cannot recover such damages. See, *e.g.*, *Bani-Esraili v. Lerman*, 505 N.E.2d 947, 948 (N.Y. 1987) (denying damages for postmajority expenses in wrongful-birth case on basis that state statutes establish that "a parent has no legal obligation to continue the support of a child after majority").

¶ 73 The case law from other states supports the framework we suggested in *Siemieniec*. If the common law and statutory law of this state make a plaintiff legally responsible for payment

-14-

of certain expenses, the tortfeasor who caused the harm is liable for those expenses. If the common law and statutory law of this state do not impose such an obligation on a plaintiff, the tortfeasor cannot be held liable for expenses that the plaintiff elects, but is not legally obligated, to incur.

¶ 74    Because the common law and statutes of the State of Illinois do not require the plaintiff parents to support their child after he reaches the age of majority, they may not recover his extraordinary postmajority expenses as an element of their damages. However, they argue that public policy justifies a departure from the general rule.

¶ 75                                    4. *Public Policy*

¶ 76    Defendants argue that the public policy of this state is clear that outside the context of divorce, where postmajority support is limited to two contexts and is in the discretion of the court, parents are under no legal obligation to support an adult child. Thus, they assert, because the plaintiff parents in a wrongful-birth action are not legally obligated to support a child who will be unable to support himself as an adult, the tortfeasor whose negligence caused them to decide to conceive the child or to continue the pregnancy cannot be said to have caused the parents to bear this expense. Defendants also argue that imposing these costs on providers of genetic and prenatal testing and counseling services would discourage the development and provision of genetic services and would create an anomaly in Illinois tort law where parents may recover damages in a wrongful-birth action that are not available to the child in a wrongful-life claim.

¶ 77    Plaintiffs argue that the public policy of the state is expressed in the Illinois Constitution of 1970 and in the "central purpose" of tort law to hold a tortfeasor responsible for foreseeable results of his negligence.

¶ 78    The appellate court did not base its holding on public policy. However, the concurring justice wrote *in toto*:

> "I write to concur with the majority and to make one succinct point: We believe very simply that it is the public policy of this State to allow parents of a permanently disabled child to allege and prove damages for the costs of caring for the child after reaching majority. The parents have a right to allege and seek to prove an action against tortfeasors, rather than have to assume personally the costs of providing for the child's lifelong needs. Moreover, we believe it is preferable for the alleged tortfeasors to pay these costs, if found liable, than for the taxpayers to be required to assist in paying them.
>
> In short, if there is a tortfeasor, that person should bear the burden he, she or it caused rather than the parents or society. If we are incorrect about our assumption regarding the State's public policy, it will be remedied through the legal or political process. Before that occurs, we think the approach we have chosen is a rational one." 391 Ill. App. 3d at 333 (Gallagher, J., specially concurring).

¶ 79    This brief statement does not offer any authority in support of the author's opinion about what is or should be the public policy of the State of Illinois. However, this court has noted on more than one occasion that when we determine that our answer to a question of law must

be based, in whole or in part, on public policy, it is not our role to make such policy. Rather, we "discern the public policy of the state of Illinois as expressed in the constitution, statutes, and long-standing case law." *In re Estate of Feinberg*, 235 Ill. 2d 256, 265 (2009) (citing *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 341 (1989)).

¶ 80     Article I, section 12, of the state constitution, known as the "open courts provision" or the "certain remedies clause," provides: "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, § 12.

¶ 81     Prior to the adoption of the new constitution in 1970, the open courts provision read: "Every person *ought to* find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property or reputation; he ought to obtain, by law, right and justice freely, and without being obliged to purchase it, completely and without denial, promptly, and without delay." (Emphasis added.) Ill. Const. 1870, art. II, § 19.

¶ 82     Despite the change in wording from "ought to" to "shall," this court has held that this provision is merely an expression of philosophy and does not mandate that a certain remedy be provided in any specific form. *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 435 (2000). The provision requires only that there be some remedy for an alleged wrong. *Berlin v. Nathan*, 64 Ill. App. 3d 940, 950 (1978) (stating that section 12 of the new constitution "like its predecessor," article II, section 19, of the 1870 constitution, "is an expression of a philosophy and not a mandate that a 'certain remedy' be provided in any specific form" (internal quotation marks omitted) and that "[s]o long as some remedy for the alleged wrong exists, section 12 does not mandate recognition of any new remedy").

¶ 83     Plaintiffs have a remedy for the alleged wrong done to them by defendants–an action for wrongful birth, recognized as a matter of common law by this court in *Siemieniec*. The open courts provision of our state constitution requires no more than this. The types of damages available in such an action are determined by the basic premise of tort law, which we also discussed in *Siemieniec*:

> "The general rule of damages in a tort action is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated. Remote, contingent, or speculative damages do not fall within this general rule. (See D. Dobbs, Remedies sec. 3.1 (1973); C. McCormick, Damages sec. 137 (1935).)" *Siemieniec*, 117 Ill. 2d at 259.

¶ 84     Thus, the plaintiff parents in that case were entitled to recover the damages that flowed from the defendants' breach of duty, "that is, only the extraordinary expenses that are attendant to the care and treatment of the afflicted child," and not "the expenses associated with the raising of a normal, healthy child." *Id.*

¶ 85     In effect, we were articulating the fundamental premise of tort law, which is part of the long-standing public policy of this state, that a tortfeasor is to be held liable for the harm that he causes, no more and no less. Because the plaintiff parents intended to conceive and bear a child and did so, it could not be said that the costs of child-rearing in general were caused

by the defendant's negligence. Thus, we limited the parents' recovery to "the extraordinary expenses" they would incur raising a child with hemophilia. *Id.* at 260.

¶ 86     In the present case, the defendants have not caused the parents to be responsible for supporting Timothy after he reaches the age of majority. This is a burden that the parents intend to accept voluntarily. Their willingness to do so cannot overcome the fundamental premise that the defendant has not caused them to bear this burden.

¶ 87     In addition, if we were to hold wrongful-birth defendants liable to parents for the child's postmajority expenses, we would obscure the distinction we made in *Siemieniec* between wrongful birth and wrongful life, a distinction that the legislature has not seen fit to alter.

¶ 88     A child who is born with a genetic or congenital condition does not have a cause of action in this state against a health care provider whose breach of the standard of care "precluded an informed parental decision to avoid his conception or birth." *Id.* at 236. His life, while burdened by his condition, is "as a matter of law, always preferable to nonlife." *Id.* at 239-40. We therefore rejected the premise that the child has "the right to prove, if he can, what his unusual condition will cost when he reaches majority." *Id.* at 241.

¶ 89     In the ordinary medical negligence case alleging a prenatal or neonatal injury, the child's claim is that but for the defendant's negligence, he would have been born healthy. See *Id*. For example, in *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895 (2007), the defendant hospital was found liable to the infant and his parents for failing to diagnose and treat the newborn's hypoglycemia. The appellate court stated that because parents are responsible for the medical expenses of their minor children, the common law "gives parents a cause of action against a tortfeasor who, by injuring their child, caused them to incur the medical expenses." *Id.* at 922. In this case, however, the parents' recovery was reduced by 30% based on their contributory negligence.

¶ 90     In *Bauer*, it was undisputed that because of the effects of the missed diagnosis and delayed treatment, the child would never be self-supporting. *Id.* at 903-04. In an effort to reduce the amount of damages for postmajority expenses by the amount of the parents' contributory negligence, the hospital argued on appeal that the parents would be obligated to support him even after the age of majority and that, therefore, the damages for his future caretaking and medical expenses belonged to the parents, not to the child. *Id.* at 922-23. The appellate court disagreed, stating that the defendants "are responsible for the costs of [the child's] postmajority caretaking and medical expenses, which were caused by their negligence." *Id.* at 923. Thus, these damages belonged to the child and were recoverable in his cause of action and the damages awarded to him could not be reduced by his parents' contributory negligence. *Id.*

¶ 91     The distinction between claims for wrongful life, medical negligence causing injury to a child, and wrongful birth illustrates the public policy of this state with regard to damages in tort. The injured plaintiff is to be made whole and the defendant is to be held responsible for all harm proximately caused by his negligence.

¶ 92     In the wrongful-life context, there is no cause of action because the child, while burdened, cannot be said to have suffered a legal wrong. *Siemieniec*, 117 Ill. 2d at 246. In the medical negligence context, costs incurred during the injured child's minority are damages

-17-

to the parents while costs incurred after the age of majority are damages to the child himself. *Bauer*, 377 Ill. App. 3d at 923. In the wrongful-birth context, the nature of the harm is not that the defendant caused the child's condition, but that the defendant deprived the parents of the opportunity to make an informed decision. The defendant is liable for all harms proximately caused to the plaintiff parents, which does not include any expenditures they voluntarily make for the support of their child as an adult.

¶ 93    We conclude that based on our constitution, statutes, and common law, the public policy of the State of Illinois favors preserving this distinction.

¶ 94    We turn to the question of damages for emotional distress.

¶ 95                                B. Damages for Emotional Distress

¶ 96    Defendants next argue that the appellate court erred in holding that plaintiffs stated a cognizable claim for negligent infliction of emotional distress. According to defendants, the appellate court's decision runs counter to *Siemieniec*, which rejected the plaintiffs' claim for emotional distress damages.

¶ 97    This court in *Siemieniec*, in assessing the plaintiffs' emotional distress claim, applied the zone-of-danger rule articulated in *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546 (1983). Prior to *Rickey*, recovery for negligently inflicted emotional distress was denied unless it was accompanied by a contemporaneous physical injury to or impact on the plaintiff. *Rickey*, 98 Ill. 2d at 550. *Rickey* replaced this "impact rule" with the zone-of-danger rule.

> "Basically, under [the zone-of-danger rule] a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress. This rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact. The bystander [in addition] must show physical injury or illness as a result of the emotional distress caused by the defendant's negligence." *Rickey*, 98 Ill. 2d at 555.

¶ 98    *Siemieniec* applied this rule and concluded the plaintiffs could not satisfy it because there were "no allegations in the complaint from which it can be said that the defendants' alleged negligence in any way endangered the parents of the impaired child." *Siemieniec*, 117 Ill. 2d at 261.

¶ 99    Plaintiffs argue that their claim for negligent infliction of emotional distress should not have been dismissed because they adequately pleaded facts that, if taken as true, meet the zone-of-danger test. Specifically, they claim that they are physically endangered when caring for Timothy. He is unable to control his upper body and as a result will strike and "head butt" his mother. Older individuals with Angelman Syndrome often exhibit violent behavior that can cause injury to themselves or others. Thus, as Timothy becomes larger and stronger, instances of physical injury to his parents are likely to become more serious. His parents assert that as a result of being in this zone of danger as they care for their disabled son and for other reasons, they suffer severe emotional distress and that their distress is a foreseeable

consequence of defendants' negligence.

¶ 100	In the alternative, plaintiffs urge us to either (1) determine that because they are the "direct victims" of the tort of wrongful birth, they are not bystanders and should not be held to the zone-of-danger rule when they claim damages for their emotional distress or (2) overrule this portion of *Siemieniec* by recognizing an exception to the zone-of-danger rule when wrongful-birth plaintiffs also plead negligent infliction of emotional distress.

¶ 101	Defendants, in their reply brief, ask that the portion of the plaintiffs' brief arguing that they are "direct victims" of the tort of wrongful birth be stricken because they did not make this argument in the appellate court. We conclude that because they properly preserved the issue of their ability to recover damages for emotional distress in the appellate court, they may offer an alternative argument in support of that issue as appellees in this court. For reasons that follow, we agree with plaintiffs that they have stated a claim for emotional distress damages as direct victims of the tort of wrongful birth.

¶ 102	Plaintiffs' second alternative argument implicates *stare decisis* principles. The doctrine of *stare decisis* expresses the policy of the courts to stand by precedents and not to disturb settled points. *People v. Colon*, 225 Ill. 2d 125, 145 (2007); *Vitro*, 209 Ill. 2d at 81; *Wakulich*, 203 Ill. 2d at 230. In other words, a question once deliberately examined and decided should be considered as settled and closed to further argument, so that the law will not change erratically, but will develop in a principled, intelligible fashion. *Colon*, 225 Ill. 2d at 146.

¶ 103	*Stare decisis*, however, is not an inexorable command. *Vitro*, 209 Ill. 2d at 82; *Colon*, 225 Ill. 2d at 146. "While adherence to the doctrine of *stare decisis* is important to the stability of the law, *** when doubts are raised in the minds of the court as to the correctness of its decision, it is its duty to re-examine the question involved in the case." *Doggett v. North American Life Insurance Co. of Chicago*, 396 Ill. 354, 360-61 (1947). If it is clear the court has made a mistake, it will not decline to correct it, even if the mistake has been reasserted and acquiesced in for many years. *Colon*, 225 Ill. 2d at 146. Nevertheless, this court will not depart from precedent merely because it might have decided otherwise if the question were a new one. *Vitro*, 209 Ill. 2d at 82; *Colon*, 225 Ill. 2d at 146. Moreover, any departure from *stare decisis* must be specially justified, and prior decisions should not be overruled absent good cause or compelling reasons. *Vitro*, 209 Ill. 2d at 82; *Colon*, 225 Ill. 2d at 146. In general, a settled rule of law that does not contravene a statute or constitutional principle should be followed unless doing so is likely to result in serious detriment prejudicial to public interests. *Colon*, 225 Ill. 2d at 146; *Vitro*, 209 Ill. 2d at 82. Good cause to depart from *stare decisis* also exists when governing decisions are unworkable or badly reasoned. *People v. Sharpe*, 216 Ill. 2d 481, 520 (2005); *Colon*, 225 Ill. 2d at 146.

¶ 104	With these principles in mind, we address plaintiffs' contention that *Siemieniec*'s application of the zone-of-danger rule in a wrongful-birth case is error.

¶ 105	As previously noted, the zone-of-danger rule was designed for a different type of case, where the plaintiff's theory of liability is the negligent infliction of emotional distress. *Rickey*, the source of this rule, exemplifies such a case. The plaintiff, Robert, who was eight years old, was on a descending escalator with his five-year-old brother, Richard, when

Richard's clothing became entangled in the mechanism, choking him. Richard could not breathe for "a substantial period of time." *Rickey*, 98 Ill. 2d at 549. Robert, who apparently suffered no impact or injury, alleged emotional distress as a result of witnessing the accident that severely injured his brother.

¶ 106    In such cases, where the claim of emotional distress is freestanding and not anchored to any other tort against the plaintiff, courts have applied special restrictions such as the zone-of-danger rule because of concerns regarding the possibility of fraudulent claims or frivolous litigation. See *Rickey*, 98 Ill. 2d at 555.

¶ 107    However, these special restrictions have no logical bearing on a wrongful-birth claim, where a tort has already been committed against the parents. Wrongful-birth plaintiffs do not assert a freestanding emotional distress claim, but merely assert emotional distress as an element of damages for a personal tort. "For these reasons, the physical manifestation and zone-of-danger rules offer no occasion to reject mental distress damages in wrongful birth cases any more than they would do so in the case of libel or invasion of privacy." 2 Dan B. Dobbs, Law of Remedies § 8.2, at 414 (2d ed. 1993).

¶ 108    In *Siemieniec*, the plaintiffs clearly saw their emotional harm claim in this light. They sought damages for emotional distress as "a natural and foreseeable consequence of the injury they sustained," a consequence which "should be included as an essential element in the calculation of damages." *Siemieniec*, 117 Ill. 2d at 260-61.

¶ 109    However, in addressing this claim, this court apparently viewed it as a separate theory of tort liability–a freestanding claim of negligent infliction of emotional distress– rather than as an element of damages flowing from the wrongful-birth tort itself. A possible explanation for this may lie in the questions certified by the circuit court, which appeared to treat the parents' claim for emotional distress as a separate tort. However, whatever the source of the misunderstanding, this was error.

¶ 110    Our error and similar errors by the courts of other states have drawn sharp criticism. See 2 Dan B. Dobbs, Law of Remedies § 8.2, at 414 n.21 (2d ed. 1993) (citing *Siemieniec* and other wrongful-birth cases that have denied emotional distress damages altogether, adding that "[i]n some authorities the distinction between emotional distress as *damages* and emotional distress as a freestanding *tort* seems to have been overlooked" (emphasis in original)).

¶ 111    The nature of the error is evident when one considers that damages for emotional distress are available to prevailing plaintiffs in cases involving other personal torts such as defamation (see, *e.g.*, *Slovinski v. Elliott*, 237 Ill. 2d 51 (2010)); conversion (see, *e.g.*, *Cruthis v. Firstar Bank, N.A.*, 354 Ill. App. 3d 1122 (2004)); and misappropriation of identity (see, *e.g.*, *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815 (2003)). See also 2 Dan B. Dobbs, Law of Remedies § 8.2, at 413-14 (2d ed. 1993) ("When it comes to mental or emotional distress, the usual rule allows free recovery of emotional distress damages to any victim of a personal tort.").

¶ 112    Thus, in the wrongful-birth context, the Florida Supreme Court rejected application of the state's "impact doctrine," a hybrid of the impact and zone-of-danger approaches, to wrongful-birth cases. "[W]e are not certain that the impact doctrine ever was intended to be

applied to a tort such as wrongful birth." *Kush v. Lloyd*, 616 So. 2d 415, 422 (Fla. 1992). The court noted that such an approach should not be applied "where emotional damages are an additional 'parasitic' consequence of conduct that itself is a freestanding tort apart from any emotional injury." *Kush*, 616 So. 2d at 422. The court added that the impact doctrine "also generally is inapplicable to recognized torts in which damages often are predominately [*sic*] emotional, such as defamation or invasion of privacy." *Kush*, 616 So. 2d at 422. The court stated:

> "There can be little doubt that emotional injury is more likely to occur when negligent medical advice leads parents to give birth to a severely impaired child than if someone wrongfully calls them liars, accuses them of unchastity, or subjects them to any other similar defamation. A defamation may have little effect, may not be believed, might be ignored, or could be reversed by trial publicity. But the fact of a child's serious congenital deformity may have a profound effect, cannot be ignored, and at least in this case is irreversible. Indeed, these parents went to considerable lengths to avoid the precise injury they now have suffered. We conclude that public policy requires that the impact doctrine not be applied within the context of wrongful birth claims." *Kush*, 616 So. 2d at 422-23.

See also *Greco v. United States*, 893 P.2d 345, 351 n.10 (Nev. 1995) (the plaintiff "seeks to recover for a *direct* and personal injury, not because of mental distress occasioned by an injury to [her child]" (emphasis in original)); *Naccash v. Burger*, 290 S.E.2d 825, 831 (Va. 1982) (concluding plaintiffs' emotional distress was "direct result of wrongful conduct"; "it would be wholly unrealistic to say that the [plaintiffs] were mere witnesses to the consequences of the tortious conduct involved in this case") (cited with approval in *Rich v. Foye*, 976 A.2d 819, 828 (Conn. Super. Ct. 2007)); *Keel v. Banach*, 624 So. 2d 1022, 1030 (Ala. 1993) (jury could conclude that defendants, in failing to inform mother of possibility of giving birth to child with severe congenital abnormalities, "directly deprived her and, derivatively, her husband, of the option to accept or reject a parental relationship with the child and thus caused them to experience mental and emotional anguish upon their realization that they had given birth to a child afflicted with severe multiple congenital abnormalities").

¶ 113    In light of these considerations, we conclude that we erred in *Siemieniec* in applying the zone-of-danger rule to wrongful-birth plaintiffs' claims for emotional distress. We overrule *Siemieniec* on this point, and specifically hold that the zone-of-danger rule applies only in cases where the plaintiff's theory of liability is the negligent infliction of emotional distress. It does not apply where, as in a wrongful-birth case, a tort has already been committed against the plaintiffs and they assert emotional distress as an element of damages for that tort.

¶ 114    We note that plaintiffs, in drafting their complaint, fashioned their pleadings to meet the zone-of-danger test. Because we now reject that test, plaintiffs should be allowed, on remand to the circuit court, to amend their pleadings accordingly.

¶ 115                                  C. Statute of Limitations

¶ 116    Defendants maintain that the circuit court's order of dismissal can be affirmed on other

grounds and, thus, that remand for consideration of plaintiffs' claim for emotional distress damages is not necessary. Specifically, they argue the appellate court erred in declining to consider their statute of limitations defense as an alternate ground for affirming the circuit court's judgment.

¶ 117    As previously noted, in 2006, while plaintiffs' first amended complaint was pending, defendants moved for summary judgment on the ground that plaintiffs failed to bring suit against them within the two-year limitations period set forth in section 13-212 of the Code of Civil Procedure (735 ILCS 5/13-212 (West 2006)). The circuit court denied the motion, reasoning, in part, that there was "at least a question of fact" as to when the statute was triggered and the limitations period began to run. Subsequently, in 2008, the circuit court entered the order at issue in this case, dismissing plaintiffs' third amended complaint with prejudice pursuant to section 2-615 of the Code. Defendants raised the statute of limitations issue in the appellate court, but the question was not addressed in the appellate court's opinion. Defendants included the issue as one of the "points relied upon in seeking review" in their petition for leave to appeal.

¶ 118    Plaintiffs argue initially that defendants' statute of limitations defense is not properly before this court. Plaintiffs note that defendants raised this defense in the circuit court on a motion for summary judgment, which was denied. Plaintiffs cite the general rule that the denial of a motion for summary judgment is not a final order and is therefore not appealable. According to plaintiffs, the only issue on appeal is the circuit court's dismissal of their complaint under section 2-615.

¶ 119    Ordinarily, the denial of summary judgment is not appealable, because such an order is interlocutory in nature. However, we have recognized an exception to this rule in certain circumstances, as when the parties have filed cross-motions for summary judgment and one party's motion is granted and the other party's denied. Because the order disposes of all issues in the case, review of the denial of summary judgment may be had. *In re Estate of Funk*, 221 Ill. 2d 30, 85 (2006). Our appellate court has similarly concluded that the propriety of the denial may be considered if the case is properly before a reviewing court from a final judgment and no trial or hearing has been conducted. *DePluzer v. Village of Winnetka*, 265 Ill. App. 3d 1061, 1064 (1994); *La Salle National Bank v. Malik*, 302 Ill. App. 3d 236, 247 (1999).

¶ 120    Here, the circuit court's order dismissing plaintiffs' third amended complaint with prejudice was final and appealable. Because the circuit court's order disposed of all issues in the case, and because defendants have properly preserved the issue at each stage of this litigation, we reject plaintiffs' argument that defendants' statute of limitations defense is not properly before us and, in the interest of judicial economy, we review the issue. For the reasons that follow, we hold that the circuit court correctly found that there existed a question of material fact that precluded entry of summary judgment.

¶ 121    Section 13-212 provides, in pertinent part, that any tort action arising out of patient care against a physician or hospital must be brought within "2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known" of the injury. 735 ILCS 5/13-212(a) (West 2006). Under the discovery rule, "a cause of action accrues, and

-22-

the limitations period begins to run, when the party seeking relief knows or reasonably should know of an injury and that it was wrongfully caused." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 285 (2003).

¶ 122    In the case at bar, defendants argue that plaintiffs knew or reasonably should have known of their claim against defendants well before September 7, 2002. According to defendants, the date of discovery thus was more than two years before September 7, 2004, the date plaintiffs sued defendants, and plaintiffs' claim therefore was time-barred under section 13-212. Plaintiffs counter that the discovery date was September 30, 2002, when Amy first learned that the result of Brandon's UBE3A sequence analysis was "abnormal." According to plaintiffs, this was "the earliest [they] could possibly have discovered their cause of action." Plaintiffs argue the date defendants were sued, September 7, 2004, thus came within the two-year limitations period.

¶ 123    As noted, the circuit court denied defendants' motion, reasoning, in part, that there was "at least a question of fact" as to when the statute of limitations was triggered and the two-year period began to run. Our review of the record persuades us the circuit court was correct. "The time at which a party has or should have the requisite knowledge under the discovery rule to maintain a cause of action is ordinarily a question of fact." *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 250 (1994). Thus, summary judgment in this case would be appropriate only if the undisputed facts allow for only one conclusion: that more than two years elapsed between the time which the Clarks knew or should have known of their injury and the date on which they filed their lawsuit. See *id.* Because there was a disputed question of material fact as to when the Clarks knew or reasonably should have known of their injury, the circuit court correctly denied defendants' motion for summary judgment. See *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162-63 (2007).

¶ 124                                      III. CONCLUSION

¶ 125    In sum, we affirm the judgment of the appellate court reversing the circuit court's dismissal of plaintiffs' claims for negligent infliction of emotional distress. We reverse that portion of the appellate court's judgment holding that plaintiffs may recover damages for the postmajority expenses of caring for their son. We also affirm the circuit court's denial of defendants' motion seeking summary judgment under section 13-212. The cause is remanded to the circuit court of Cook County for further proceedings in consonance with this opinion.

¶ 126    Judgment affirmed in part and reversed in part;

¶ 127    cause remanded.

¶ 128    JUSTICE FREEMAN, concurring in part and dissenting in part:

¶ 129    While I agree with part of today's decision (*supra* ¶ 92), I do not agree with the court's conclusion that the Clarks cannot recover extraordinary medical expenses in this case. Whether a parent is legally obligated to support a child past the age of 18 is irrelevant to deciding whether a negligent doctor should be liable for postmajority damages. The only

relevant concern is whether tort law generally should allow for parents who have been the victims of clear negligence, as in this case, to recover the medical expenses generated for the expenses they voluntarily will assume in order to continue to care for their disabled child. I agree with the authority that says that parents like the Clarks are entitled to all extraordinary medical and educational costs for the child's life expectancy as a consequence of defendants' negligence. I therefore respectfully dissent from that portion of today's opinion.

¶ 130                                               I

¶ 131    The court stresses today that the damage issue is a matter for the legislature. The legislature may or may not take up the court's invitation, but the reasons given in the opinion are not any reason to do so. The United States Supreme Court has observed that "[p]erhaps no field of the law comes closer to the lives of so many families in this country than does the law of negligence." *Tiller v. Atlantic Coast Line R.R.*, 318 U.S. 54, 73 (1943). Negligence law is, by tradition, a matter for the judiciary. Indeed, this court's recognition in *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230 (1987), of a claim for medical malpractice in genetic counseling involved the application of the doctrine of negligence. The determination of the scope of the common law doctrine of negligence is within this court's province. "[J]udges rather than legislatures usually define what counts as a tort and how compensation is to be measured." 1 Dan B. Dobbs, The Law of Torts § 1 (2001). See also *Renslow v. Mennonite Hospital*, 67 Ill. 2d 348 (1977). If this court has the authority to recognize the claim in the first instance, it likewise has the authority to determine its character.

¶ 132    That is, in fact, what this court did in *Siemieniec*. Some courts have criticized the "extraordinary costs rule," adopted by this court in *Siemieniec*, *i.e.*, parents in so-called "wrongful birth" cases recover only the extraordinary medical and educational costs attributable to the birth defect, and not the ordinary costs associated with child-rearing. The criticism stems from the fact that the rule "departs from traditional principles of tort damages." *Smith v. Cote*, 513 A.2d 341, 349 (N.H. 1986). The rule "represents an application in a tort context of the expectancy rule of damages employed in a breach of contract case." *Id.* While some courts have not allowed damages on account of this (see, *e.g.*, *Rieck v. Medical Protective Co.*, 219 N.W.2d 242 (Wis. 1974)), other courts have, noting that it is within the power of the judiciary to shape the law of negligence in order to do justice between parties. See *Smith*, 513 A.2d at 349 (noting need to find a rule that will protect defendants as well as will compensate parents); see also Deana A. Pollard, *Wrongful Analysis in Wrongful Life Jurisprudence*, 55 Ala. L. Rev. 327 (2004) (suggesting that the application of the expectancy rule, without more, results in undercompensation to the victims of this form of malpractice).

¶ 133    Today, we pick up where *Siemieniec* left off: What is the extent of the extraordinary medical and educational costs attributable to the birth defect that can be recovered in these cases?[3] While this court in *Siemieniec* acknowledged one popular rationale to use to answer

---

[3]It bears noting that since this court's decision in *Siemieniec*, the General Assembly has not enacted any specific legislation in this area. This inaction stands in stark contrast to action taken by

the question by pointing to the minority/majority analysis, it is not the only rationale to develop in this area in the 23 years since *Siemieniec* was decided.

¶ 134    The injury complained of is the alleged failure of defendants to properly inform the Clarks that their eldest son's Angelman Syndrome was the result of a genetic defect passed through his mother and therefore was not an accident of nature. Had the Clarks been accurately informed of this fact by defendants, it would have weighed in their decision whether to exercise their constitutional right to use contraceptives in order to limit the size of their family. *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). Importantly, this constitutional right protects a "distinctively personal interest" because it "involves profound moral and personal issues" that only the patient can make. *Canesi v. Wilson*, 730 A.2d 895 (N.J. 1999). Thus, the injury in this particular form of medical malpractice is the parents' lost opportunity to make the personal decision in weighing the consequences of whether to give birth to a child who might have permanently disabling physical and mental birth defects. The damage sustained is all the foreseeable consequences proximately caused by that injury.

¶ 135    In analyzing this claim, it is important to keep in mind that the alleged cause of action is based on the failure to inform the Clarks of the fact that their eldest son's Angelman Syndrome was genetically caused and of the consequences resulting from conception in light of that knowledge. What is being claimed, then, is that the medical providers, through their negligence, deprived the Clarks of the right to accept or reject a parental relationship, as they would define that relationship. *Smith*, 513 A.2d at 348. Generally, the deprivation of that right by the negligent misconduct of another has been held to create a cause of action in the parents. *Schroeder v. Perkel*, 432 A.2d 834 (N.J. 1981); *Naccash v. Burger*, 290 S.E.2d 825, 830 (Va. 1982).

¶ 136    Importantly, the Clarks sought genetic counseling because they were already the parents of one child with Angelman Syndrome. They knew that an additional child diagnosed with Angelman Syndrome would never be able to care for himself in any way at any age. They knew that another pregnancy which led to the birth of another child with Angelman Syndrome would have serious consequences, not just on that child, but on them and their eldest son. Such a person would require a lifetime of extraordinary medical expenses and would need extraordinary care in order to tend to his or her daily needs. This is precisely why the Clarks sought genetic counseling. Defendants' negligence served to deprive the Clarks of an informed choice of whether they wished to undertake the heavy obligations in rearing a second child with such a debilitating condition. See Wolf Wolfensberger & Frank J. Menolascino, *A Theoretical Framework for the Management of Parents of the Mentally Retarded*, in Psychiatric Approaches to Mental Retardation 475 (Menolascino ed. 1970). Had the Clarks received accurate medical information in a timely fashion, they might have concluded that the life of a future child, even one with Angelman Syndrome, was worth the cost of assuming the associated burdens and expenditures, but this is unlikely since the point

legislators in other states, which have enacted statutes specifically prohibiting claims for wrongful birth. Note, *The Right to Recovery for Emotional Distress Arising From a Claim for Wrongful Birth*, 32 Am. J. Trial Advoc. 143, 157 & n.108 (2008).

of genetic counseling was to avoid the possibility. Nevertheless, some individuals "confronted by tragedy respond magnificently and become exemplary parents [while] others do not. See, *e.g.*, *Becker v. Schwartz*, 386 N.E.2d 807 (N.Y. Ct. App. 1978) in which the parents subsequently put their mongoloid child up for adoption." *Schroeder v. Perkel*, 432 A.2d at 845 (Handler, J., concurring in part, dissenting in part). But the real injury to the Clarks was being deprived of the ability to weigh the pros and cons of having to rear a second child who will eventually become an adult dependent.[4]

¶ 137 The Clarks' injury does not cease to exist nor do the consequences of it disappear the day Timothy turns 18. Timothy will never become emancipated; he will never be able to care for himself. The Clarks therefore bear the additional burden of knowing that Timothy will never be able to make for himself any of the decisions needed for his day-to-day care and survival, and will not be able to look after his own best interests. It has been recognized that when parents are denied the opportunity to make the decision denied here, important personal interests are impaired, including the interest in preserving personal autonomy with respect to their family. *Smith*, 513 A.2d at 348.[5]

¶ 138 As the Seventh Circuit Court of Appeals has recognized, cases such as this one, termed "wrongful birth" actions,[6] sound in negligence and are "little different from an ordinary medical malpractice action." *Robak v. United States*, 658 F.2d 471, 476 (7th Cir. 1981). As such, it involves a "failure by a physician to meet a required standard of care, which resulted in specific damages to the plaintiffs." *Id.* It is a recognized principle of tort law to afford compensation for injuries sustained by one person as the result of the conduct of another. W. Page Keeton, Prosser and Keeton on Torts § 2, at 6 (5th ed. 1984). Illinois courts have recognized that when seeking to restore a plaintiff to the wholeness plaintiff had before the commission of a tort, specific damages rules should not be inflexibly applied if substantial justice would not be accomplished. *Wolf v. Bueser*, 279 Ill. App. 3d 217 (1996). A defendant is liable for all reasonably anticipated injuries resulting from a wrongful act. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525 (1996).

¶ 139 It was foreseeable that as a result of defendants' negligence, the Clarks, a couple of child-

---

[4]Illinois law defines a "dependent" as a person who is "unable to maintain himself and is likely to become a public charge." 755 ILCS 5/1-2.06 (West 2008).

[5]In my view, Timothy suffers injury, too, not from being given life or even from being born with a disabling impairment, but rather from being part of a family unit that, due to defendants' negligence, was unprepared, be it financially or emotionally or both, to deal with the *consequences* stemming from his birth.

[6]The terms "wrongful life," "wrongful birth" and "wrongful pregnancy" (also termed "wrongful conception") are seen by some as "a play on the statutory tort of 'wrongful death.' " Alexander M. Capron, *Tort Liability in Genetic Counseling*, 79 Col. L. Rev. 618, 634 n.62 (1979). The use of such terms, however, has only "spawn[ed] confusion" (*id.*), the effect of which has "distort[ed] or impair[ed] judicial vision." *Greco v. United States*, 893 P.2d 345, 348 n.5 (1995). See also *Viccaro v. Milunsky*, 551 N.E.2d 8, 9 n.3 (Mass. 1990).

bearing age, would conceive a second child who would incur lifelong medical expenses. All of the consequences that the Clarks sought to avoid in fact did come to pass here. They conceived and had a second son who suffers from the same incurable disease that his brother has. The disease will prevent him from taking care of himself in any way. Having not been given the choice, prior to Timothy's conception, of voluntarily assuming the burdens of having a second son with Angelman Syndrome, the Clarks have alleged that they will continue to care for Timothy's care "into his majority." This means more than voluntarily paying Timothy's extraordinary medical and educational expenses. It demonstrates the Clarks' intent to have a say in the care and nurture of their impaired son. It means they will not abandon him and are committed to caring for his best interests. This is significant in assessing the consequences of defendants' negligence.

¶ 140    It is beyond question that Timothy's condition will not improve once he achieves the age of majority. He will still have Angelman Syndrome. Timothy's condition will not magically disappear after the age of 18. Thus, decisions made by his parents during his minority will affect what happens to him after the age of 18. As an example, suppose the Clarks are presented with, during Timothy's minority, a medical treatment plan that will continue past the age of majority and is in Timothy's best interests to undertake? Are the Clarks foreclosed from acting in a certain way because they will not be able, financially, to continue the treatment once Timothy reaches the age of 18? More to the point, if Timothy is to be made a ward of the state, will the Clarks lose their ability to make decisions for Timothy that they, as his blood relatives, believe are in his best interests? The Clarks find themselves in this conundrum as the direct result of defendants' negligence to them, and it constitutes a further legal injury to them. The Clarks should not be concerned about where the money will come from in the future when making Timothy's medical decisions during his minority. The only way to compensate for this injury is to allow the Clarks to recover the extraordinary medical and educational costs for however long Timothy is expected to live.

¶ 141    It is for this reason that the court's minority/postmajority analysis is a faulty premise. Initially, it completely overlooks the fact that the parents of a minor disabled child are free to give up the child for adoption or otherwise terminate their legal, parental obligation. Unless specific steps are taken to secure the funds in trust, parents are free to use the funds in ways that often are not in the best interests of the child. See *Greco v. United States*, 893 P.2d 345, 352 (Nev. 1995); *Arche v. United States*, 798 P.2d 477, 486 (Kan. 1990). Secondly, it overlooks the fact, noted above, that no material difference in the condition will occur at the age of majority. The Florida Supreme Court recognized this and, as a result, held that a parents' claim for extraordinary damages is not dependent "on any *future* parental duty owed *** after [the child] reaches majority." (Emphasis in original.) *Kush v. Lloyd*, 616 So. 2d 415, 424 (Fla. 1992). Such a rule best preserves the parents' *present* role as "guardians of the best interests of an impaired child." *Id.* It bears repeating that the parents would not be faced with these types of critical-care decisions had the defendants not withheld material

information that they were dutybound to give to them.[7]

¶ 142    The normal measure of damages for the commission of a tort is all damages that are the proximate result of the tortfeasor's negligence. Timothy's birth and *all* extraordinary expenses resulting from it were the proximate result of defendant's negligence. Put another way, but for defendants' breach of duty to properly advise the Clarks, they would not have been put in the position they now are in: having a second child with Angelman Syndrome who will never be able to care for himself and will never become emancipated and for whom they will need to make critical decisions for the future. Had the Clarks been given the right to decide, with accurate information, whether to risk conception, they would have weighed not only how that decision would affect that second child, but also how a second child would affect their current family, both in terms of financial and emotional commitments. The only way to compensate them fully and fairly is to allow them to recover the extraordinary medical and educational costs that Timothy will need for the duration of his life expectancy. Such an award satisfies the purpose of tort damages because it serves to compensate the victims, deter negligence, and encourage due care. See *Siemieniec*, 117 Ill. 2d at 258. In my view, the Clarks should be allowed to recover all extraordinary expenses caused by the impairing condition for the duration of the child's life expectancy. Justice strongly favors this recognition, and I can find no countervailing policy to hold otherwise.

¶ 143    One final observation needs to be made with respect to how such extraordinary damages should be managed. Given the procedural posture of this case, we have no way of knowing how long Timothy will live. He may not survive his minority. Any award made in these types of cases should be placed in a reversionary trust, whether the reward be one limited to the minority of the child or, as I suggest, for the lifetime of the child, however long it is proven at trial to be. Under such a trust, the money would be disbursed as needed to pay for the costs of the impaired person. Upon death, the remainder, if any, would be returned to the defendant. This merits attention for two primary reasons. First, it assures the impaired individual will be adequately cared for and, secondly, it assures that, if the impaired individual dies before reaching majority or the age of his life expectancy, the parents do not receive a windfall. The use of such trusts have been cited with approval by other courts. See *Robak v. United States*, 503 F. Supp. 982 (N.D. Ill. 1980); *Kush*, 616 So. 2d at 424.

¶ 144                                              II

¶ 145    Rather than undertake an analysis that assesses the true nature of the injury suffered by the Clarks and its consequences, the court employs a contradictory statutory analysis to hold that the parents cannot recover extraordinary expenses incurred past the age of majority. The primary statute relied upon is a provision from the Public Aid Code which obligates parents

---

[7]Other courts have noted that by recognizing the parents' right to recover all extraordinary medical and educational costs for the child's lifetime in the parents' cause of action, they need not address the more difficult questions posed by wrongful-life causes of action since any reward to the child would be duplicative of that given to the parents. See *Rich v. Foye*, 976 A.2d 819 (Conn. 2007); *Smith*, 513 A.2d at 354.

to pay for only the support of a child under 18 years old. Essentially, because the Clarks are, as one court has described, "free to bid their children a fiscal farewell at age 18" (*Childers v. Childers*, 552 P.2d 83, 85 (Wash. App. 1976)), they cannot be held legally responsible for any of the extraordinary medical expenses necessary for Timothy's care past the age of majority and thus cannot recover such damages from defendants.

¶ 146     I do not see how this section of the Public Aid Code applies here. Those parents who receive state aid are required to reimburse the state for such services. To the extent that Timothy may ultimately receive benefits from state aid agencies, such agencies are empowered to seek reasonable compensation from beneficiaries who have sufficient financial means. In any event, as I demonstrated above, defendants' liability to the Clarks is not dependent upon the parents' liability for the expenses, but on the parents' status as Timothy's guardians.[8]

¶ 147     Parenthetically, I note that in determining the Public Aid Code applies in this case, the court asks, in one of its many "what if" questions: "will that child have a claim on his parents' estate to the disadvantage of nondisabled siblings?" *Supra* ¶ 65. In fact, the child would have a claim, not over the "parents' estate," but on the surviving parent's estate under the Probate Act because Timothy is a dependent under the Act. See 755 ILCS 5/5-15-2 (West 2008).

¶ 148     Indeed, the court's view of section 10-2 of the Public Aid Code renders its construction of section 513 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/513 (West 2006)) contradictory at best and unconstitutional at worst. The court acknowledges that under this statute, parents may be required to provide support for a disabled adult child. Section 513(a)(1), which the appellate court below relied on in concluding wrongful-birth plaintiffs could recover postmajority damages, provides:

> "(a) The court may award sums of money out of the property and income of either or both parties or the estate of a deceased parent, as equity may require, for the support of the child or children of the parties who have attained majority in the

---

[8]While the Public Aid Code speaks of parental liability ending at the age of 18, other statutes reveal that the General Assembly's view of the parental obligation is not static. Section 12-21 of the Criminal Code of 1961, for example, imposes criminal liability for failure to provide proper care for a disabled person. 720 ILCS 5/12-21 (West 2008). Moreover, under the federal Health Care Reform Bill, Congress has required that parents keep their dependent children on their insurance policies for ages that go beyond 18. Illinois has already enacted legislation which implements the Congressional mandate. 215 ILCS 5/356z.12 (West 2008). These divergent expressions of legislative intent in this area further underscore the fallacy in analyzing the damages question in terms of minority/majority. Tending to family members who are unable to take care of themselves has long been seen as exemplary in the eyes of both Congress and the General Assembly. In Illinois, the parents of a disabled person who are the person's custodial caretakers are entitled to make a claim against the estate of such a person under the Probate Act. 755 ILCS 5/18-1.1 (West 2008). Those who provide care for disabled adults are entitled to federal and State tax breaks. 26 U.S.C. §§ 22, 152. These types of provisions demonstrate a public policy that supports, not deters, family unity in dealing with disease and aging.

following instances:

"(1) When the child is mentally or physically disabled and not otherwise emancipated, an application for support may be made before or after the child has attained majority." 750 ILCS 5/513(a)(1) (West 2006).

The court today concludes that section 513(a)(1), as well as section 513(a)(2), which deals with postmajority educational expenses, do not apply beyond the divorce context, stating:

"[T]he clear intent of sections 513(a)(1) and (a)(2) is to provide the child of divorced parents who is unable to support himself due to a disability or who seeks higher education with the standard of living he would have enjoyed had his family remained intact." *Supra* ¶ 62.

However, if there is, as the court asserts, no postmajority support obligation for both parents, under the Public Aid Code, *i.e.*, an intact family situation, then there can be no such obligation in the divorce situation. Divorce proceedings cannot create a greater obligation on the parents individually than there was originally. Moreover, if divorced parents may be required to provide support which married parents have no obligation to provide, this presents serious, potential constitutional questions concerning both equal protection and due process.

¶ 149    The court goes on to state:

"Plaintiffs' brief notes that they are presently separated and could, at some future date, divorce, and one of them might seek support for Brandon and Timothy from the other under section 513(a)(1). This would be an application of the statute in the manner the legislature intended–to preserve, as much as possible, the benefits of an intact family for the children of divorce." *Supra* ¶ 63.

This construction of section 513 is such that the court seems to be encouraging divorce as the way around its ruling. The court's construction of the statute actually encourages a divorce in such situations. The suggestion, callous as it is in the face of the tragedy this family has endured, unsurprisingly contravenes the legislative intent behind the Marriage Act. Specifically, our General Assembly has directed that the provisions of the Marriage Act are to be "liberally construed and applied to promote its underlying purposes," which include "strengthen[ing] and preserv[ing] the integrity of marriage and safeguard[ing] family relationships." 750 ILCS 5/102(2) (West 2006).

¶ 150                                III

¶ 151    In discussing the issue of damages in cases such as this, more than one court has noted that "law is more than an exercise in logic and logical analysis, although essential to a system of ordered justice, should not become an instrument of injustice." *Procanik by Procanik v. Cillo*, 478 A.2d 762 (N.J. 1984); *Turpin v. Sortini*, 643 P.2d 954, 965 (Cal. 1982). If the state of the law in Illinois is, in fact, what the court holds it to be, then it may be high time that this court reconsider its refusal, in *Siemieniec* to recognize so-called "wrongful-life" claims.

¶ 152    In explaining its rejection of wrongful life, the court noted that most courts in other jurisdictions had reached the same result. One reason is the general unwillingness to hold that

a child can recover damages for achieving life:

> "The threshold problem has been the assertion by the infant plaintiffs not that they should not have been born without defects, but that they should not have been born at all. The essence of the infant's cause of action is that the negligent conduct of the defendants deprived the child's mother from obtaining an abortion which would have terminated its existence. [Believing] that human life, no matter how burdened, is, as a matter of law, always preferable to nonlife, the courts have been reluctant to find that the infant has suffered a legally cognizable injury by being born with a congenital or genetic impairment as opposed to not being born at all." *Siemieniec*, 117 Ill. 2d at 239-40.

A related problem is the difficulty of measuring appropriate damages, which involves a calculation "dependent upon the relative benefits of an impaired life to no life at all, '[a] comparison the law is not equipped to make.' " *Id*. at 240 (quoting *Becker v. Schwartz*, 386 N.E.2d 807, 812 (N.Y. 1978)).

¶ 153    This court also emphasized "the preciousness and sanctity of human life" as a basis for rejecting wrongful-life claims. It agreed with those courts which "have reasoned that recognizing a duty to the unborn child to prevent his birth with defects represents a 'disavowal' of the sanctity of life. Such a disavowal of life offends society's deeply rooted belief that life, in whatever condition, is more precious than nonexistence." *Siemieniec*, 117 Ill. 2d at 250. The court quoted the Supreme Court of Idaho:

> "Basic to our culture is the precept that life is precious. As a society, therefore, our laws have as their driving force the purpose of protecting, preserving and improving the quality of human existence. To recognize wrongful life as a tort would do violence to that purpose and is completely contradictory to the belief that life is precious." *Blake v. Cruz*, 698 P.2d 315, 322 (Idaho 1984) (quoted in *Siemieniec*, 117 Ill. 2d at 250).

Pointing to Illinois' "strong public policy of preserving the sanctity of human life," the court stated: "To recognize that [a child] has a fundamental right not to be born would thus undermine this legislatively expressed policy favoring childbirth over abortion." *Siemieniec*, 117 Ill. 2d at 249.

¶ 154    This policy regarding the sanctity of human life remains in effect in Illinois. *Siemieniec* has not been overruled on this point. However, a "high regard for the sanctity of life," however noble sounding on paper, means nothing if it not honored in "real life." A court that embraces this as its public policy should not ignore the needs of the living nor should it allow those who are negligent to rely on the public to foot the bill when a child born as a result of that negligence reaches the age of majority. The Clarks' complaint alleges, in support of their claim for postmajority damages:

> "Timothy *** is and always will be mentally disabled. Angelman Syndrome is a permanent genetic disorder with no chance of ever being cured. Timothy *** has no chance of leading an independent life as an adult or being emancipated. As such, Timothy *** is now a disabled minor and after he turns 18 he will be a disabled adult. As a disabled adult, Timothy *** will not be able to care for himself in any

-31-

way and will require substantial sums of money to sustain his life."

The court holds today that the Clarks may not recover any of these "substantial sums" from defendants. As a result, they will be left to shoulder these expenses on their own, or, more likely, will be forced to place Timothy in the care of the state, possibly away from his family. Either way, the effect on Timothy's quality of life, already burdened with severe disabilities, undoubtedly will be negative. Ironically, this unfortunate result arises, in large part, from *Siemieniec*'s regard for the sanctity of human life, an important basis for rejecting wrongful-life claims. But placing Timothy and his parents in such a predicament hardly demonstrates a high regard for the preciousness and sanctity of human life. Nor does it further the purpose of "protecting, preserving and improving the quality of human existence" (*Blake*, 698 P.2d at 322). If such a predicament is the inevitable result of *Siemieniec*'s rejection of wrongful life, perhaps this decision should be re-examined.

¶ 155    As one legal commentator has recognized, the above scenario

> "may leave the real victim, the newly emancipated disabled person with little or no ability to earn even minimal wages, without compensation, relegating him to a state institution despite the possibility that he could lead an independent life with sufficient financial resources. Thus, recognizing wrongful birth but not wrongful life may seriously undercompensate for the damages caused by the malpractice, shifting the financial responsibility onto the taxpayers when parental responsibility ceases upon emancipation." Deana A. Pollard, *Wrongful Analysis in Wrongful Life Jurisprudence*, 55 Ala. L. Rev. 327, 367-68 (2004).

Justice Gallagher, writing separately in the appellate court, made a similar point, though couched in terms of a wrongful-birth action rather than one for wrongful life. The appellate court, of course, was bound to follow *Siemieniec*'s rejection of wrongful life.

> "We believe very simply that it is the public policy of this State to allow parents of a permanently disabled child to allege and prove damages for the costs of caring for the child after reaching majority. The parents have a right to allege and seek to prove an action against tortfeasors, rather than have to assume personally the costs of providing for the child's lifelong needs. Moreover, we believe it is preferable for the alleged tortfeasors to pay these costs if found liable, than for the taxpayers to be required to assist in paying them." 391 Ill. App. 3d at 333 (Gallagher, J., specially concurring).

As I noted at the outset of this opinion, the court stresses the need for legislative action in this area. It is my belief that legislative action is necessary in light of the court's analysis of the injury and its attendant damages in cases such as this. It is my sincere hope that the General Assembly will look into this area of the law and provide the necessary redress for future plaintiffs who are put into the situation the Clarks find themselves in through no fault of their own.

¶ 156    I have suggested in Part I of this opinion a judicious way to compensate plaintiffs that is compatible with normal tort principles. This includes the use of a reversionary trust that would ensure both justice as well as fairness to all involved: the victimized parents, the victimized child, and the tortfeasor. Nothing in today's opinion indicates that my suggestions

contravene in any way any public policy of this state. Although the medical profession may have let down the Clarks, Illinois' legal system need not be allowed to do the same.

¶ 157    In sum, I would allow the Clarks to recover as damages for negligence in this medical malpractice action all extraordinary expenses for Timothy's care in his lifetime. I base this not on any legal duty of the parents to support Timothy past majority, but on the parents' status as his current guardians to provide for his care.

¶ 158    I do agree with the court's decision to overrule that portion of *Siemieniec* which erroneously applied the so-called "zone of danger" rule to defeat claims for emotional distress arising from negligence in genetic testing. I agree that the rationale used in *Siemieniec* was inapplicable to the negligence at issue in this case and join in that portion of today's opinion. Ironically, the court relies strongly on *Kush v. Lloyd*, the same Florida Supreme Court case that I rely on in answering the damages question. I believe *Kush*, which addressed facts remarkably similar to those here, is well reasoned on all of the complex issues presented in these types of medical malpractice cases. I also agree with the court's resolution of the statute of limitations issue. Accordingly, I join in that portion of today's opinion as well.